# EXHIBIT A



Proskauer Rose LLP   Eleven Times Square   New York, NY 10036-8299

August 7, 2020

**VIA ELECTRONIC MAIL AND REGULAR MAIL**

Kathleen M. McKenna
Member of the Firm

d +1.212.969.3130
f 212.969.2900
kmckenna@proskauer.com
www.proskauer.com

Michael J. Willemin Esq.
Wigdor LLP
85 Fifth Avenue
New York, NY 10003
E-mail: mwillemin@wigdorlaw.com

Re:   **Jennifer Eckhart and Cathy Areu v. Fox News Network, LLC, Ed Henry, Sean Hannity, Tucker Carlson, and Howard Kurtz, Civil Case No. 1:20-cv-05593**

Dear Mr. Willemin:

On behalf of Fox News Network, LLC, Sean Hannity, Tucker Carlson, and Howard Kurtz (the "Fox Defendants"), we enclose a draft Memorandum of Law in support of the Fox Defendants' Rule 11 Motion for Sanctions.  This shall serve as formal notice under Federal Rule of Civil Procedure 11(c)(2). Failure to withdraw Areu's frivolous and sanctionable claims within twenty-one (21) days of the date of this notice will expose both Areu and your firm to the risk of sanctions and attorney fees.

Sincerely,

/s *Kathleen M. McKenna, Esq.*

Enclosures

cc:   Lily Claffee, Esq.
      Carl Guida, Esq.
      Lloyd Chinn, Esq.
      Keisha-Ann Gray, Esq.
      Anthony J. Dick, Esq.
      Ariel N. Volpe, Esq.

1

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JENNIFER ECKHART and CATHY AREU, :

                :

             Plaintiffs, :      Civil Case No. 1:20-cv-05593

                :

   against :

                :

FOX NEWS NETWORK, LLC, ED HENRY, :
SEAN HANNITY, TUCKER CARLSON and :
HOWARD KURTZ, in their individual and :
professional capacities, :

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**DEFENDANTS FOX NEWS NETWORK, LLC, SEAN HANNITY, TUCKER
CARLSON, AND HOWARD KURTZ'S RULE 11 MOTION FOR SANCTIONS.**

August __, 2020

Anthony J. Dick
Ariel N. Volpe
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
Tel. (202) 879-3939
E-mail: ajdick@jonesday.com

Kathleen M. McKenna, Esq.
Lloyd B. Chinn, Esq.
Keisha-Ann G. Gray, Esq.
Danielle J. Moss, Esq.
Yonatan L. Grossman-Boder
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036-8299
Tel. (212) 969-3000
Fax. (212) 969-2900
E-mail: KMcKenna@proskauer.com

*Attorneys for Defendants Fox News Network, LLC, Sean Hannity,
Tucker Carlson, and Howard Kurtz*

PLEASE TAKE NOTICE that upon the accompanying Memorandum of Law and the

Affidavits and Exhibits annexed thereto, Defendants move the United States District Court for the

Southern District of New York (located in the Daniel Patrick Moynihan United States Courthouse,

500 Pearl Street, New York, New York) for an order imposing sanctions on Plaintiff Catherine

Areu and her attorney under Federal Rule of Civil Procedure 11(c).

Dated:   August ___, 2020

By:   _____
      Kathleen M. McKenna, Esq.
      Lloyd B. Chinn, Esq.
      Keisha-Ann G. Gray, Esq.
      Danielle J. Moss, Esq.
      Yonatan L. Grossman-Boder
      PROSKAUER ROSE LLP
      Eleven Times Square
      New York, New York 10036-8299
      (212) 969-3000
      kmckenna@proskauer.com

      Anthony J. Dick
      Ariel N. Volpe
      JONES DAY
      51 Louisiana Ave., NW
      Washington, DC 20001
      Tel. (202) 879-3939
      Fax. (202) 879-1700
      E-mail: ajdick@jonesday.com

      *Attorneys for Defendants*
      *Fox News Network, LLC, Sean Hannity,*
      *Tucker Carlson, and Howard Kurtz*

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
JENNIFER ECKHART and CATHY AREU,            :
                                            :
                        Plaintiffs,         :        Civil Case No. 1:20-cv-05593
                                            :
    against                                 :
                                            :
FOX NEWS NETWORK, LLC, ED HENRY,            :
SEAN HANNITY, TUCKER CARLSON and            :
HOWARD KURTZ, in their individual and       :
professional capacities,                    :
                                            :
                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS FOX NEWS NETWORK, LLC, SEAN HANNITY, TUCKER CARLSON,**
**AND HOWARD KURTZ'S RULE 11 MOTION FOR SANCTIONS.**

---

August ☐, 2020

Anthony J. Dick                     Kathleen M. McKenna, Esq.
Ariel N. Volpe                      Lloyd B. Chinn, Esq.
JONES DAY                           Keisha-Ann G. Gray, Esq.
51 Louisiana Ave., NW               Danielle J. Moss, Esq.
Washington, DC 20001                Yonatan L. Grossman-Boder
Tel. (202) 879-3939                 PROSKAUER ROSE LLP
Fax. (202) 879-1700                 Eleven Times Square
E-mail: ajdick@jonesday.com         New York, New York 10036-8299
                                    Tel. (212) 969-3000
                                    Fax. (212) 969-2900
                                    E-mail: KMcKenna@proskauer.com

*Attorneys for Defendants Fox News Network, LLC, Sean Hannity,*
*Tucker Carlson, and Howard Kurtz*

# TABLE OF CONTENTS

                                                                            Page

PRELIMINARY STATEMENT ........................................................................1

BACKGROUND .............................................................................................2

    A.  Eckhart's Allegations and Fox News's Immediate Suspension
        and Firing of Ed Henry ......................................................................2

    B.  Areu's Unrelated Claims Against Other Individual Defendants .................3

    C.  The Complaint .................................................................................4

    D.  Areu's Refusal to Withdraw Her Frivolous Claims..............................7

ARGUMENT .................................................................................................10

I.    Areu's Claims Are Factually Frivolous ...............................................11

    A.  Carlson ...........................................................................................13

    B.  Hannity...........................................................................................14

    C.  Kurtz .............................................................................................16

II.   Areu's Claims Are Legally Frivolous ...................................................17

    A.  Areu Cannot Invoke Federal Jurisdiction ..........................................18

    B.  Areu Was Not an "Employee" of Fox News ......................................20

III.  Areu's Frivolous Claims Are Geared to an Improper Purpose...............22

IV.  Dismissal and Monetary Sanctions Are Appropriate.............................24

CONCLUSION ..............................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abner Realty, Inc. v. Adm'r of Gen. Servs. Admin.*,
  No. 97 CIV. 3075 (RWS), 1998 WL 410958
  (S.D.N.Y. July 22, 1998) ...................................................................................22, 23

*Amorosa v. Ernst & Young LLP*,
  No. 03 Civ. 3902(CM), 2010 WL 245553
  (S.D.N.Y. Jan. 20, 2010) ...........................................................................................11

*Blackrock Balanced Capital Portfolio v. HSBC
  Bank USA, Nat'l Ass'n*,
  95 F. Supp. 3d 703 (S.D.N.Y. 2015) .........................................................................19

*Brown v. Maxwell*,
  929 F.3d 41 (2d Cir. 2019) ........................................................................................22

*Cameau v. Nat'l Recovery Agency*,
  No. 15-CV-2861, 2018 WL 4853050
  (E.D.N.Y. Sept. 28, 2018) .........................................................................................11

*Doe v. Anonymous Inc.*,
  No. 18 CIV. 10924 (PAC), 2019 WL 2616904
  (S.D.N.Y. June 25, 2019) ...........................................................................................21

*Farmer v. Shake Shack Enters.*,
  No. 19 CIV. 9425, 2020 WL 4194860
  (S.D.N.Y. July 21, 2020) ...........................................................................................20

*Figurowski v. Marbil Invs., LLC*,
  No. 14-cv-7034, 2015 WL 4000500
  (E.D.N.Y. July 1, 2015) .............................................................................................20

*Four Keys Leasing & Maint. Corp. v. Simithis*,
  849 F.2d 770 (2d Cir. 1988) .......................................................................................17

*Galin v. Hamada*,
  283 F. Supp. 3d 189 (S.D.N.Y. 2017) ...........................................................12, 13, 24

*Galonsky v. Williams*,
  No. 96 CIV. 6207 (JSM), 1997 WL 759445
  (S.D.N.Y. Dec. 10, 1997) .....................................................................................22, 23

*Geiss v. Weinstein Co. Holdings LLC*,
  383 F. Supp. 3d 156 (S.D.N.Y. 2019) ........................................................................19

*Gelfman Int'l Enters. v. Miami Sun Int'l Corp.*,
  No. 05-CV-3826, 2009 WL 2957849
  (E.D.N.Y. Sept. 10, 2009) .........................................................................................12

*Gutierrez v. Fox*,
  141 F.3d 425 (2d Cir. 1998) .......................................................................................12

ii

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Harry Winston, Inc. v. Kerr*,
72 F. Supp. 2d 263 (S.D.N.Y. 1999)...................................................................19

*Healey v. Chelsea Res., Ltd.*,
947 F.2d 611 (2d Cir. 1991)..............................................................................17

*Hughes v. Twenty-First Century Fox, Inc.*,
304 F. Supp. 3d 429 (S.D.N.Y. 2018).................................................................21

*Klein v. Aicher*,
No. 19-CV-9172, 2020 WL 4194823
(S.D.N.Y. July 21, 2020) ...................................................................................12

*LaVigna v. WABC Television, Inc.*,
159 F.R.D. 432 (S.D.N.Y. 1995) ........................................................................18

*Lyndonville Sav. Bank & Trust Co. v. Lussier*,
211 F.3d 697 (2d Cir. 2000)..........................................................................19, 20

*Morley v. Ciba-Geigy Corp.*,
66 F.3d 21 (2d Cir. 1995)...................................................................................22

*Murray v. Dominick Corp. of Can., Ltd.*,
117 F.R.D. 512 (S.D.N.Y. 1987) ........................................................................24

*New V & J Produce Corp. v. NYCCaterers Inc.*,
No. 13 CIV. 4861 ER, 2014 WL 5026157
(S.D.N.Y. Sept. 29, 2014)..................................................................................18

*Regent of the Univ. of California on behalf of UC Davis Health Sys.
v. Stidham Trucking Inc.*, No. 16-cv-02835, 2017 WL 3840259
(E.D. Cal. Sept. 1, 2017) ...................................................................................12

*People ex rel. Abrams v. Terry*,
45 F.3d 17 (2d Cir. 1995)..............................................................................19, 20

*Pereira v. 3072541 Canada Inc.*,
No. 17-CV-6945, 2018 WL 5999636
(S.D.N.Y. Nov. 15, 2018)...................................................................................12

*Safe-Strap Co. v. Koala Corp.*,
270 F. Supp. 2d 407 (S.D.N.Y. 2003).................................................................24

*Salovaara v. Eckert*,
222 F.3d 19 (2d Cir. 2000).................................................................................11

*Sussman v. Bank of Isr.*,
56 F.3d 450 (2d Cir. 1995).................................................................................23

*United Mine Workers v. Gibbs*,
383 U.S. 715 (1966)..........................................................................................19

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*United States v. City of New York*,
   359 F.3d 83 (2d Cir. 2004)........................................................................20

*Williamson v. Recovery Ltd.*,
   542 F.3d 43 (2d Cir. 2008)........................................................................11

*Wood v. Brosse U.S.A., Inc.*,
   149 F.R.D. 44 (S.D.N.Y. 1993) ................................................................18

STATUTES

18 U.S.C. § 1591 ...............................................................................................4, 19

28 U.S.C. § 1367 ...................................................................................................19

OTHER AUTHORITIES

Fed. R. Civ. P. 11 ..................................................................................................24

David Bauder, *Fox stars Hannity, Carlson and fired anchor
   Henry in lawsuit*, AP News (July 20, 2020),
   https://tinyurl.com/y2dulgc .....................................................................7

CBS This Morning, *Former Fox news host Ed Henry accused of rape*
   (July 21, 2020), https://tinyurl.com/y5mr8wvj; ......................................7

CNN New Day, *Camerota on new lawsuit: I guess Fox News
   is rotten to the core* (July 21, 2020), https://tinyurl.com/y4gpjep9 ............7

Michael M. Grynbaum, *Two Women Sue Fox News, Claiming
   Misconduct by Ed Henry and Others*, N.Y. Times (July 22, 2020),
   https://tinyurl.com/y56gqg74 .....................................................................7

Scott Neuman, *Civil Suit Against Former Fox News Anchor Ed Henry
   Alleges Rape, Sexual Misconduct*, Nat'l Pub. Radio (July 21, 2020),
   https://tinyurl.com/yy23y9xx......................................................................7

Jackie Wattles, *Ed Henry returning to Fox News after affair revelation*,
   CNN Business (Aug. 25, 2016),
   https://money.cnn.com/2016/08/25/media/ed-henry-fox-news-return. ......2

Erik Wemple, *Fox News says new tabloid stories on Ed Henry raise
   'serious questions*, Wash. Post (May 10, 2016),
   https://www.washingtonpost.com/blogs/erik-wemple/wp/2016/05/10/fox-
   news-says-new-tabloid-stories-on-ed-henry-raise-serious-questions/ ......2

## PRELIMINARY STATEMENT

Plaintiff Cathy Areu's claims rest on a series of fabrications designed to extort a multi-million-dollar settlement out of Fox News. Failing that, she has continued to press her false charges to inflict maximum damage on the reputation of the network and some of its top on-air talent, heedless of the human cost. Her allegations are not only false, but are flatly contradicted by her own e-mails, texts, and other documentary evidence in her possession. She knew that her claims were false at the time she made them, and her counsel either knew or should have known through the most basic investigation. In the weeks since then, the maliciousness of her complaint has only become more blatant as Fox News and the other Defendants have adduced an overwhelming array of evidence showing the falsity of her claims. But despite being confronted with this evidence, and despite her inability to explain away her own texts, e-mails, and social-media posts, Areu and her counsel have refused to withdraw her claims.

Areu's claims are not only factually baseless but legally frivolous as well. She has no basis to be in federal court because she does not assert any federal claims, and her state-law claims are completely unrelated to the single federal "sex-trafficking" charge asserted by her co-plaintiff, Jennifer Eckhart. She also cannot assert claims as an "employee" of Fox News because, as she and her counsel know, she was never an employee but an unpaid guest who was invited on air to express her political opinions. The only possible conclusion is that she contrived her claims and then shoehorned them into Eckhart's unrelated case to feed a media frenzy against Fox News.

Rule 11 was designed for exactly this type of case. Instead of asserting good-faith claims, Areu and her counsel sought to abuse the court system to smear Fox News and some of its top on-air personalities with false and frivolous claims under the cloak of litigation privilege. To address this brazen misconduct, Defendants respectfully request appropriate sanctions including fees, costs, and dismissal of her claims.

1

## BACKGROUND

**A.     Eckhart's Allegations and Fox News's Immediate Suspension and Firing of Ed Henry**

On June 25, Jennifer Eckhart contacted Fox News through her counsel at Wigdor LLP ("the Wigdor Firm") alleging that Fox News anchor Ed Henry had engaged in a clandestine affair with her involving sexual assault and rape. Compl. ¶¶ 3-9. At the time of this alleged conduct, Eckhart was an associate producer who worked on a Fox Business Network show in New York, and Henry was a news correspondent who worked in the Washington bureau. *Id.* ¶ 59, 61. Eckhart alleged that she had three sexual encounters with Henry while he was visiting New York—one in 2015 in a hotel room that was consensual but reflective of a power imbalance; another in 2015 on company premises that involved forced oral sex; and a third in 2017 in a hotel room that involved violent rape. *Id.* ¶¶ 70-73, 76-81, 86-102.

The same day that Fox News learned of Eckhart's allegations, the company suspended Henry and hired an outside law firm, Davis & Gilbert, to conduct an independent investigation. Affidavit of Kevin Lord ¶¶ 2-3. Five days later, the investigators reported that the alleged sexual encounters occurred, but that the evidence on consent was inconclusive. Fox News terminated Henry the next morning. *Id*. ¶ 4

Before Eckhart's claims, no one had ever complained that Henry had sexually harassed them, as far as Fox News is aware. *Id*. In 2016, Henry had been suspended and demoted for publicity surrounding a consensual affair he had with a woman he met in Las Vegas. But as was widely reported, that discipline was for lack of judgment and reputational damage to the company, not workplace misconduct.[1]

---

[1] *See, e.g.*, Erik Wemple, *Fox News says new tabloid stories on Ed Henry raise 'serious questions*, Wash. Post (May 10, 2016), https://www.washingtonpost.com/blogs/erik-wemple/wp/2016/05/10/fox-news-says-new-tabloid-stories-on-ed-henry-raise-serious-questions/; Jackie Wattles, *Ed Henry returning to Fox News after affair revelation*, CNN Business (Aug. 25, 2016), https://money.cnn.com/2016/08/25/media/ed-henry-fox-news-return.

Notwithstanding Henry's termination, the Wigdor Firm demanded that Fox News pay a $10 million settlement to avoid a lawsuit that would damage the company's reputation by alleging a culture of institutional apathy to sexual misconduct in the workplace. Decl. of Kathleen McKenna ¶¶ 2-3, 10. Fox News declined. *Id.* ¶ 4, 7.

## B.   Areu's Unrelated Claims Against Other Individual Defendants

Immediately after Henry's termination, Fox News received an e-mail from Cathy Areu, an unpaid guest who occasionally appeared on Fox News, alleging, among other things, that Henry had sent her pornographic texts. Affidavit of Deborah Steele, Ex. A. Fox News immediately asked the firm of Davis & Gilbert to open an independent investigation into Areu's allegations. Lord Aff. ¶ 7. Davis & Gilbert reached out to Areu and learned she had retained the Wigdor Firm. *Id.* ¶ 8.

On July 9, Wigdor sent Fox News a demand letter on behalf of Areu seeking to pressure the company into settling by making new and unrelated allegations against some of the company's top on-air personalities. First, Areu alleged that after she appeared on Tucker Carlson's show on the night of the company Christmas party, he told her that he would be alone at a hotel without his wife and children, and then stopped booking her as a guest when she rebuffed what she understood to be a sexual advance. McKenna Decl. ¶ 8. Second, she claimed that Sean Hannity asked men on the set of his show to take her out on a date for $100 and stopped booking her when she wouldn't "play along." *Id*. Third, she claimed that Howard Kurtz asked her to meet him at his hotel for sexual purposes and stopped booking her when she refused. *Id*. And fourth, she alleged that Fox News contributor Gianno Caldwell tried to pressure her into going on a lunch date him in exchange for an introduction to a high-profile public personality. *Id.*

Areu refused to participate with the Davis & Gilbert investigation unless her statements could not be cited in any future litigation, McKenna Decl. ¶ 9. The investigators did not accept

that demand. *Id.* But Davis & Gilbert was able to interview the accused on-air personalities and Fox News staff, and to examine relevant documents. McKenna Decl. ¶ 9; Lord Aff. ¶ 11. On July 16, the outside investigators reported that there was no evidence to support Areu's allegations of misconduct. Lord Aff. ¶ 11.

## C.    The Complaint

On July 20, after Fox News refused to pay a settlement, the Wigdor Firm filed a consolidated complaint on behalf of Eckhart and Areu. As the sole hook for federal jurisdiction, the complaint alleges that Henry and Fox News violated the federal ban on "sex trafficking." 18 U.S.C. § 1591, *et seq.* Compl. ¶¶ 17, 162-75. In particular, the complaint alleges that Fox News and Henry "formed a venture" in which Henry coerced Eckhart into sexual conduct, and "Fox News benefited from participation in the venture because Fox News received value from Mr. Henry's services and benefited financially from his continued employment." *Id.* ¶ 167-68. Even though the company immediately suspended and then terminated Henry after learning of Eckhart's allegations, the complaint alleges that Fox News fostered a culture of "institutional apathy towards sexual misconduct." *Id.* ¶ 2. To bolster this sensationalized narrative, the complaint emphasizes Areu's demonstrably false and unrelated allegations against Carlson, Hannity, Kurtz, and Caldwell, all of whom remain with the company.

Areu does not assert any federal claims, but asserts several state-law claims alleging that Carlson, Hannity, Kurtz, and Fox News engaged in employment discrimination and retaliation against her in violation of the New York City Human Rights Law and the New York State Human Rights Law. *Id.* ¶¶ 176-95. According to the complaint, Areu qualified as a protected "employee" under these laws because, even though she appeared on Fox News solely as an unpaid guest, she had a "part time employment relationship" with the company, and she "hoped to earn a full time

<div align="center">4</div>

position" as a paid commentator. *Id.* ¶¶ 46, 124. The complaint does not attempt to explain how Areu's state-law claims are related to Eckhart's federal sex-trafficking claim, but nevertheless asserts that they fall within the court's "supplemental jurisdiction." *Id.* ¶ 41.

1.     With respect to Carlson, Areu alleges that she was harassed after appearing on *Tucker Carlson Tonight* "in December 2018." *Id.* ¶ 29. She claims that "while she was on set trying to get out of the chair," a writer or producer "whispered in [her] ear" that "Mr. Carlson wanted her to stay until the very end of the show to chat with him," and she "had no choice but to comply . . . due to the fact that she was on live television while tied to her chair with a microphone on her that was attached to the chair." *Id.* ¶ 30. After the show ended, Carlson "changed on set into his leather jacket for the annual Christmas party," which "he told Ms. Areu he would only be attending for approximately 10 minutes." *Id.* ¶ 32. He then purportedly "began telling Ms. Areu that he would be alone in New York City that night, and specifically said that he would be staying alone in his hotel room without any wife or kids." *Id.* ¶ 33. Based on these alleged remarks, the complaint claims that, "without question," Carlson "was probing to see whether Ms. Areu was interested in a sexual relationship." *Id.* ¶ 34. And after she "declined to spend the night at his hotel," Carlson "promptly retaliated against Ms. Areu, who was featured on his show only three times in 2019 and has not appeared once in 2020." *Id.*

2.     As to Hannity, the complaint alleges that Areu "was a relatively regular face on *The Sean Hannity Show* until March 8, 2018." *Id.* ¶ 24.  After she appeared on the show that night, she alleges that Hannity "threw $100 on the set desk," "in front of the entire studio crew," and "began calling out to the men in the room and demanding that someone take Ms. Areu out on a date for drinks at *Del Friscos*." *Id.*  He "repeatedly yelled, 'who wants to take her on a date?' 'Take her on a date to *Del Friscos*.'" *Id.* Although Areu was "mortified and made clear that she was incredibly

5

uncomfortable," she "could not even leave because . . . she was 'hooked into' studio equipment that could only have been removed by a stagehand." *Id*. ¶¶ 24-25. After she refused to "play along," Areu claims that she "was hardly ever, if ever at all, invited back" on *Hannity*. *Id*. ¶ 28.

**3.**     With respect to Kurtz, Areu alleges that "while [he] was in New York City, he invited [her] to come to his hotel," which she "politely declined," but "invited [him] to dinner with her and a friend who was in town." *Id*. ¶ 35. She alleges that he "declined" because he "plainly wanted to see Ms. Areu only if she were alone and at his hotel (*i.e.*, for sexual reasons)." *Id*. The next morning, she alleges, Kurtz "refused to meet with her at the studio." *Id*. ¶ 36. She claims that he later told her, "in sum and substance," that she is "the only woman here who won't come to my hotel room," and that he then retaliated against her because she "only appeared approximately three times on Media Buzz following her rejection of Mr. Kurtz's advances." *Id*.

4.     As to Caldwell, the complaint does not name him as a defendant but contains several paragraphs alleging that he "attempt[ed] to coerce [Areu] into dating him" in exchange for an introduction to his friend Ann Coulter. *Id*. ¶ 37. Specifically, she claims that Caldwell "made clear that the 'price' to meet Ms. Coulter would be a date with Mr. Caldwell," because "after she asked, 'Can I take you two for lunch,' [he] responded, 'Take me to lunch.'" *Id*. ¶ 38.

The day of the complaint, Areu's counsel issued a press release repeating and embellishing her allegations. Among other things, the press release claimed that Hannity "auction[ed] off Ms. Areu to anyone in the studio [] 'man enough' to take her on a date after work" and that "Ms. Areu was hooked up to the studio equipment, to go on air live, and could not even walk away during the 'auctioning.'"  Steele Aff., Ex. B at 2. The complaint does not use the words "man enough" or describe anything resembling an "auction." But the press release convinced at least one news outlet

6

to report these allegations to a national audience.[2] It also generated widespread coverage of the claims against Hannity, Carlson, Kurtz, and Caldwell.[3]

## D.    Areu's Refusal to Withdraw Her Frivolous Claims

A review of Areu's own e-mails and texts, publicly available sources, and other information revealed that Areu's allegations contained several demonstrable falsehoods and were contradicted by a number of facts and documents within her own direct knowledge and possession. On [date], Defendants sent Areu's counsel a Rule 11 letter along with a draft of this motion laying out the following true facts along with supporting documentary evidence, stating that they would move for sanctions under Rule 11 if Areu did not withdraw her false allegations within the required 21-day grace period. Decl. of Kathleen McKenna ¶ 12.

First, the night that Areu claimed Carlson invited her to his hotel room was not the night of the company Christmas party "in December," but was actually the night of a party that Carlson and his wife hosted for the staff of *Tucker Carlson Tonight* in New York at the end of November. Affidavit of Tucker Carlson ¶¶ 2, 8, *id.* Ex. A. Carlson attended the entire party and stayed in a hotel room with his wife, *id.* ¶¶ 4-5; he was not "alone in his hotel room without any wife or kids," Compl. ¶ 33. An eyewitness who was on the set overheard the conversation between Areu and Carlson and flatly contradicted Areu's account of what he said (Affidavit of Emily Lynn ¶¶ 4-5), dispelling any notion that he was "probing to see whether Ms. Areu was interested in a sexual relationship." Compl. ¶ 34. After the alleged incident, contrary to Areu's claim of retaliation, she

---

[2] Scott Neuman, *Civil Suit Against Former Fox News Anchor Ed Henry Alleges Rape, Sexual Misconduct*, Nat'l Pub. Radio (July 21, 2020), https://tinyurl.com/yy23y9xx.

[3] *See, e.g.*, CBS This Morning, *Former Fox news host Ed Henry accused of rape* (July 21, 2020), https://tinyurl.com/y5mr8wvj; CNN New Day, *Camerota on new lawsuit: I guess Fox News is rotten to the core* (July 21, 2020); https://tinyurl.com/y4gpjep9; Michael M. Grynbaum, *Two Women Sue Fox News, Claiming Misconduct by Ed Henry and Others*, N.Y. Times (July 22, 2020), https://tinyurl.com/y56gqg74; David Bauder, *Fox stars Hannity, Carlson and fired anchor Henry in lawsuit*, AP News (July 20, 2020), https://tinyurl.com/y2dulgc.

continued to be booked and appear on Carlson's show without interruption. Indeed, the evidence shows that she appeared as a guest at least five more times, and that the show attempted to book her several more times in the months immediately following the alleged incident. Affidavit of Chelsea Gilman ¶¶ 2-3.

Second, contrary to Areu's claim that Hannity asked "the men" on set to take her out on a date for money "in front of the entire studio crew," Compl. ¶ 24, contemporaneous e-mails sent by Areu confirm that Hannity did nothing of the sort. Instead, Areu e-mailed ahead of time to ask permission to bring a male friend to the set with her. When Hannity learned that the male visitor to his set was with Areu, he graciously gave them $100 to have drinks with each other after the show. Affidavit of Sean Hannity ¶ 2; Affidavit of Christen Bloom ¶¶ 2-4; Steele Aff., Ex. C. One eyewitness was in the green room with Areu, her male friend, and Hannity, and heard Areu thank Hannity for having her on the show and discuss Areu and her friend going to Del Frisco's for drinks with the money Hannity gave them. Affidavit of Tiffany Fazio ¶ 7; Hannity Aff. ¶ 2. E-mails sent by Areu later that night and the next day show her asking Hannity's booker to thank Hannity for the drinks, attaching a picture of one of the drinks she and her friend bought with Hannity's money, and confirming that she would appear again on his show the next week. Steele Aff., Ex. C. She did appear on the show again and brought the same male friend with her to the studio, and Hannity again gave them money for drinks. Hannity Aff. ¶ 3; Bloom Aff. ¶ 8. Contrary to Areu's allegation that she "was hardly ever, if ever at all, invited back" (Compl. ¶ 144), she began appearing on Hannity's show far *more* frequently after the night of the alleged incident. Before that night, she had appeared on the show only four times over a span of nine years. But afterward, she appeared at least nine times over the next 16 months. Fazio Aff. ¶ 2.

8

Third, Kurtz did not engage in any inappropriate conduct. As Areu's own e-mails show, he agreed to meet her in the afternoon at Fox News's office, at her request. When she was unable to make the meeting due to a flight delay, she tried to connect with him after work hours. Affidavit of Howard Kurtz, Ex. A at 2-3, 6-7. E-mails show that he told her he was working at his hotel and "may just have a little time to chat in the hotel lobby." *Id*. at 2. Areu then invited him to dinner, which he declined. *Id.* at 1. She then tried to invite herself to his hotel room, stating: "What's your room number? What name are you under? What's your cell? I'm coming over. We can do it the easy way or the hard way." *Id.* at 7. Kurtz ignored this message but retained the entire e-mail exchange, which shows that *she* was the one who tried to come to *his* hotel room, but *he* declined. Nor did he "retaliate" against her. To the contrary, she continued to appear on Kurtz's show at the same rate. In the nine months before the incident she appeared on his show four times. And in the nine months after, she also appeared on the show four times. Affidavit of Owen Renfro ¶ 2.

Fourth, the text messages exchanged between Areu and Caldwell prove that he too engaged in no misconduct. After Areu pushed for him to introduce her to Ann Coulter over lunch, he politely deflected by suggesting that the two of them have lunch instead. Affidavit of Gianno Caldwell, Ex. A. Throughout this innocuous exchange, Caldwell made no inappropriate comments and remained scrupulously polite despite Areu's continuing pressure for an introduction. *Id*.[4]

---

[4] Areu makes several other flagrantly false allegations even when they are irrelevant to her legal claims. For example, she claims that, during an appearance on "February 10" from the Florida studio of "Fox News affiliate" WXEL, she was groped by a cameraman, and then banned from the studio after reporting it. Compl. ¶ 152. But WXEL is a PBS affiliate, not a Fox News affiliate. Affidavit of Robert Galker ¶ 3. And Fox News, which has its own Miami news bureau serving south Florida, obviously has no corporate relationship or supervisory role over WXEL. *Id*. Moreover, Areu did not make an appearance for Fox News from the WXEL studio on February 10; the closest dates she appeared from there were on February 4 and 12. *Id*. ¶ 4. Nor was she banned for reporting sexual assault in February. Rather, as her own emails indicate she knew, WXEL permanently banned her from its facilities when, during an appearance on March 31, she stated in front of WXEL staff that she had just recovered from COVID-19, but she had entered WXEL's studio just two weeks prior. *Id*. & Exs A, B; *id.*, Ex. A at 5 ("The fact that this individual came to our facility not only on March 31st but also two weeks prior, shows a complete disregard for the safety and security of our personnel and facility. Ms. Areu will never be permitted in any of our South Florida facilities again, for any reason."); *see also id*. Ex. B at 2 (e-mail from Areu stating "We can't let people be treated like they have AIDs [sic]").

9

<center>*                    *                    *</center>

In addition to pointing out these frivolous factual allegations, the draft Rule 11 motion that Defendants gave to Areu's counsel also emphasized two legally frivolous contentions in her complaint. First, since she does not allege any federal claims, and her state-law claims are completely unrelated to Eckhart's federal "sex trafficking" claim, she has no plausible ground to invoke federal jurisdiction. And second, since she appeared on Fox News only as an unpaid guest, she cannot assert claims based on her purported status as an "employee" of the company.

Even after Defendants confronted Areu and her counsel with these frivolous aspects of her claims, she nevertheless refused to withdraw any aspect of her complaint. McKenna Decl. ¶ 13. As a result, she has left Defendants with no choice but to seek sanctions.

## ARGUMENT

Rule 11 prohibits pleadings that are factually frivolous, legally frivolous, or submitted for an improper purpose. Here, Areu's complaint flouts all three rules. First, the factual allegations underlying her claims are not only knowingly and patently false, but directly contradicted by documentary evidence including text messages and e-mails in her own possession. Defendants' draft Rule 11 motion called her attention to this and other indisputable evidence that contradicts and refutes her core factual contentions. She and her counsel could not articulate any reasonable basis for maintaining her false allegations in response, and yet they still refuse to retract them. This is precisely what Rule 11 is designed to prevent.

Second, Areu's claims are also legally frivolous. On the merits, she does not have a plausible claim to be an "employee" of Fox News. She simply appeared occasionally as an unpaid on-air guest, and she cannot articulate any plausible legal basis for why such appearances give rise to an employment relationship. If that were not enough, she also lacks any plausible ground to

<center>10</center>

invoke federal jurisdiction. She cannot claim *original* jurisdiction because she does not assert any federal claims. And she cannot claim *supplemental* jurisdiction because her state-law claims are completely unrelated to the sole federal claim of "sex trafficking" asserted by her co-plaintiff.

Third, Areu's claims are not just frivolous but plainly calculated to serve an improper purpose: to generate publicity, defame Defendants, and extort a settlement. This is clear not only from how badly she and her counsel have contorted the law to shoehorn her claims into Eckhart's unrelated lawsuit, but also from the sensationalized press release that she and her counsel issued along with the complaint. In short, the circumstances make clear that her frivolous claims are not just the result of mistaken or sloppy lawyering, but are a calculated move to use knowingly false statements as a litigation and publicity ploy. The Court should impose sanctions.

## I.     Areu's Claims Are Factually Frivolous

Under Rule 11(b)(3), all "factual contentions" in a pleading must "have evidentiary support" or be "likely [to] have evidentiary support after a reasonable opportunity for further investigation or discovery." This prohibits parties and their counsel from making "false, misleading, improper, or frivolous representations to the court." *Williamson v. Recovery Ltd.*, 542 F.3d 43, 51 (2d Cir. 2008). As this Court has recognized, "both a represented party and his attorney can be sanctioned under Rule 11(b)(3) for the factual insufficiency of a complaint." *Amorosa v. Ernst & Young LLP*, No. 03 Civ. 3902(CM), 2010 WL 245553, at *4 (S.D.N.Y. Jan. 20, 2010). Sanctions are especially appropriate when a party has "actual knowledge" of the "wrongful conduct," including when the party knows that the pleading contains "false statements." *Salovaara v. Eckert*, 222 F.3d 19, 33 (2d Cir. 2000) (internal quotations omitted).

Accordingly, courts award sanctions when a plaintiff's allegations are contradicted by publicly available evidence or evidence in the plaintiff's own possession. *See, e.g.*, *Cameau v.*

*Nat'l Recovery Agency*, No. 15-CV-2861, 2018 WL 4853050, at *3 (E.D.N.Y. Sept. 28, 2018) (imposing sanctions where a call transcript in plaintiff's possession contradicted "key factual allegations in the Complaint"); *Regents of the Univ. of Cali., on behalf of UC Davis Health Sys. v. Stidham Trucking Inc.*, No. 16-cv-02835, 2017 WL 3840259, at *2, 7-9 (E.D. Cal. Sept. 1, 2017) (imposing Rule 11 sanctions where "allegations in Plaintiff's complaint [were] directly contradicted by email evidence in Plaintiff's possession"). And in applying Rule 11, this Court has found it "particularly concerning" when a plaintiff "take[s] unreasonable positions," "omit[s] crucial facts," and "make outright misrepresentations," especially for the purpose of "extort[ing] unwarranted settlements." *Pereira v. 3072541 Canada Inc.*, No. 17-CV-6945, 2018 WL 5999636, at *3 (S.D.N.Y. Nov. 15, 2018) (Abrams, J.).

Aside from knowing falsehoods, attorneys have an "affirmative duty . . . to conduct a reasonable inquiry into the viability of a pleading before it is signed." *Gelfman Int'l Enters. v. Miami Sun Int'l Corp.*, No. 05-CV-3826, 2009 WL 2957849, at *4 (E.D.N.Y. Sept. 10, 2009) (quoting *Gutierrez v. Fox*, 141 F.3d 425, 427 (2d Cir. 1998)). The inquiry must be "objectively" reasonable. *Id*. Thus, for example, this Court recently imposed sanctions in a case involving baseless factual allegations, where the "pre-filing investigation [was] particularly lacking in light of what was available to [plaintiff and his counsel] at the time." *Klein v. Aicher*, No. 19-CV-9172, 2020 WL 4194823, at *10 (S.D.N.Y. July 21, 2020) (Abrams, J.).

Although pre-filing investigation is important, the duty to avoid frivolous factual allegations does not end after the complaint is filed. A party or an attorney "is not immune from sanctions merely because it had a reasonable basis at the time it filed its initial pleading to believe that its claim was valid." *Galin v. Hamada*, 283 F. Supp. 3d 189, 202 (S.D.N.Y. 2017), *aff'd*, 753

F. App'x 3 (2d Cir. 2018) (internal quotations omitted). Instead, a "court may impose sanctions . . . for refus[ing] to withdraw an allegation or claim even after it was shown to be inaccurate." *Id.*

Here, Areu's core factual allegations are patently frivolous. She not only knew they were false when she made them, but they are squarely refuted by e-mails, text messages, and other documentary evidence. Much of this evidence was in her possession at the time she filed her claims, and her counsel should have discovered it with any degree of diligence. Defendants' draft Rule 11 motion provided even more overwhelming evidence, further obliterating any reasonable basis for her to maintain her patently false contentions. Her refusal to withdraw these contentions thus violates Rule 11, warranting sanctions for both her and her counsel.

## A.   Carlson

Areu's claim that Carlson made sexual advances is a bald-faced lie. She claims that he invited her to his empty hotel room where he was staying "without any wife or kids," (Compl. ¶ 134), but on the night in question he was with his wife in New York, and his wife stayed with him in his hotel room. Carlson Aff. ¶¶ 5-6. The contention that he "was probing to see" whether Areu would come to his empty hotel room is thus logically incoherent and contradicted by the indisputable facts. In an attempt to lend some plausibility to her claim, she contends that Carlson's advances occurred after his show on the night of the company's "annual Christmas party" "in December 2018." Compl. ¶¶ 130, 133. But the company's annual Christmas party occurred on December 10, and Areu was not on Carlson's show that night—as even a cursory investigation would have shown. Carlson Aff. ¶ 8; Lynn Aff. ¶ 7; Chludzinski Aff. ¶ 39. Instead, as her own e-mails, her own social-media posts, and the transcripts reflect, the only night during this period that she appeared with Carlson on his show was November 30, the night of the smaller party he hosted

for his show staff, when his wife stayed with him in his hotel. Affidavit of Jacob Chludzinski, Ex. A ¶ 37; Gilman Aff. ¶ 2; Carlson Aff. ¶ 5.

It is also demonstrably false for Areu to contend that Carlson "retaliated" against her by stopping inviting her on his show after the alleged incident. In fact, his staff invited her and she appeared on the show again less than a month later, on December 28. C. Gilman Aff. ¶ 2. She then appeared on the show four times in 2019 (not "three times," Compl. ¶ 137). *Id.* And just as importantly, she was invited or booked several other times in the four months following, but had to be bumped solely due to her own unavailability, her viewpoint being redundant, or breaking news. *Id.* ¶ 3. Again, all of these facts are demonstrated by e-mails in Areu's own possession and other publicly available information, such as her Instagram account. Chludzinski Aff. ¶¶ 40, 43, 44, 49, 50. And her counsel could have learned the true facts with even a cursory investigation. *Id.*

### B. Hannity

Areu's claims against Hannity are also lies. Most glaringly, she claims that she was a "relatively regular face" on Hannity's show until "March 8, 2018," the night she refused to "play along." Compl. ¶¶ 139-44. After that night, she claims, she was retaliated against: she "was hardly ever, if ever at all, invited back to appear on 'Hannity.'" *Id.* ¶ 144. But the indisputable facts show otherwise. In fact, she had not been a "regular" on *Hannity* but had appeared as a guest only four times over a span of nine years before March 8. Fazio Aff. ¶ 2. And after that night, she was not "retaliated" against but was invited *nine more* times in less than two years. *Id.* The entire premise of her "retaliation" theory is thus blatantly false.

Even worse, Areu's "harassment" allegations against Hannity are also concocted and contrary to her own e-mails, texts, and other overwhelming evidence, including testimony from multiple eyewitnesses. She alleges a bizarre and inherently implausible scenario in which Hannity,

14

"on set and in front of the entire studio crew—and completely unsolicited—threw $100 on the set desk" and "then began calling out to the men in the room and demanding that someone take Ms. Areu out on a date for drinks at *Del Friscos*." Compl. ¶ 140. But her own e-mails and the unanimous eyewitness testimony tell a completely different story. Her e-mails show that she e-mailed Hannity's booker on the night in question to ask permission to bring her male friend named "Alex" with her to the set. Steele Aff., Ex. C at 2. She explained, "He's my good luck charm. He does yoga. Very calming. I run. I'm nuts. [smiley face emoji]." *Id.* The booker agreed, and the friend arrived on set with Areu and stayed during her appearance. *Id.*; Hannity Aff. ¶ 2; Bloom Aff. ¶ 2. When Hannity learned the male visitor on the set was with Areu, he generously gave Areu and Alex $100 to go have drinks together. *Id.*; Hannity Aff. ¶ 2; Bloom Aff. ¶¶ 2-4. Later that night, Areu wrote the *Hannity* booker, "Thanks so much for having me on. Way too much fun. Same time next week! Cathy." Steele Aff., Ex. C at 2. The next day, Areu wrote *again* to the *Hannity* staffer, "Please thank Sean [Hannity] for a fun evening. He shouldn't have! …but We did exactly as he and Alex's had bet [sic]. Down to the pineapple martini. [martini emoji]. See you next Thursday! Cathy [photo attached of the pineapple martini Areu ordered at Del Frisco's using Hannity's money]." *Id.* at 3.

Over the following weeks, Areu *again* appeared on Hannity and brought her male companion Alex with her to the set. She thanked Hannity again, shared how much she had enjoyed the cocktails at Del Frisco's, and in response Hannity, again, gave Areu and Alex money for drinks. Hannity Aff. ¶ 3; Bloom Aff. ¶ 8. Once again, Areu herself was well aware of the true facts of what happened, and her counsel easily could have discovered that her concocted "harassment" story was contradicted by her own e-mails. And her story became even more unsupportable when Defendants' draft Rule 11 motion added Areu's e-mails from the night at issue and the following

day, together with the unanimous testimony of the eyewitnesses on set who flatly contradicted Areu's account.

### C. Kurtz

Areu's allegations regarding Kurtz are not only demonstrably false but particularly egregious given that her own emails reveal that she was the one who behaved inappropriately by trying to invite herself to his hotel room. The complaint alleges that Kurtz solicited Areu to his hotel room for "sexual reasons." *(*Compl. ¶¶ 127-28). But again, Areu and her counsel willfully misrepresent the facts and selectively quote from correspondence in order to mislead the court.

As Areu's own e-mails show, she planned to meet with Kurtz on the afternoon of July 9, 2019, when he was working in the Fox News office in New York City (his home and ordinary work location are in the Washington, D.C. area). Kurtz Aff., Ex. A at 2-5. When Areu missed that meeting, she invited Kurtz out for drinks that evening. *Id*. at 2. Kurtz did not respond to Areu's invitation *Id*. Instead, he e-mailed Areu to say that, "I may just have a little time to chat in the hotel lobby." *Id*. Areu proposed that Kurtz join her and a friend for dinner instead, but Kurtz declined, saying that he had already eaten and didn't have time. *Id*. at 1. She responded, "Ugh. I want to see you! . . . he's my hair and makeup artist, and it's his bday. . . . will you be around at 9? . . . wait, don't have time? Where ya going? [smiley face emoji]." *Id*. (ellipses in original). Kurtz replied, "I've got work, believe it or not. Try me at 9." *Id*. He followed up at 9, but when she did not respond he said he was going to bed at 9:09. *Id*. at 1, 7. Within seven minutes, Areu responded, "What? I'll be right there. I'm totally available right now!!!!!!" *Id*. at 6. She then e-mailed Kurtz *again* minutes later asking, "What's your room number? What name are you under? What's your cell? I'm coming over. We can do it the easy way or the hard way." *Id*. at 7. Kurtz did not respond. *Id*. at 8.

As this exchange shows, it is entirely baseless for Areu to contend that Kurtz tried to lure her to his hotel room "for sexual reasons." Compl. ¶ 128. She was the one who initiated all of the contact, invited him out for drinks after work, repeatedly expressed a desire to meet, and inappropriately demanded his cell phone and room number so that she could come to him—which he refused. The indisputably true facts thus refute the core of Areu's factual claims.

Similarly, it is patently false for Areu to claim that Kurtz "retaliated" against her by inviting her on his show less often after she "reject[ed]" his "advances." Compl. ¶ 128. Although it would have been understandable if Kurtz stopped inviting her as a guest after her inappropriate e-mails, she continued to appear on Kurtz's show at precisely the same rate as before. In the nine months before the alleged incident she appeared on his show four times. And in the nine months after, she also appeared four times. Renfro Aff. ¶ 2. Once again, Areu was aware of all of these facts, and her counsel easily could have discovered them by a cursory review of her own e-mails.

## II.   Areu's Claims Are Legally Frivolous

In addition to Areu's knowingly false factual allegations, her claims are also sanctionable because they are legally frivolous. Rule 11(b)(2) requires that any "claims" or "legal contentions" asserted by a party must be "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." This provision prohibits parties from filing claims when "it is patently clear that [they have] absolutely no chance of success." *Healey v. Chelsea Res., Ltd.*, 947 F.2d 611, 626 (2d Cir. 1991) (internal quotations omitted). Thus, a violation occurs when "it should have been patently obvious to any attorney who had familiarized himself [or herself] with the law" that the claim could not succeed. *Four Keys Leasing & Maint. Corp. v. Simithis*, 849 F.2d 770, 773 (2d Cir. 1988). For example, this Court has awarded sanctions when a plaintiff's "Title VII and FLSA claims [were] wholly frivolous" because

17

there was "no good faith basis for arguing that [the plaintiff] should have a cause of action." *LaVigna v. WABC Television, Inc*., 159 F.R.D. 432, 435-36 (S.D.N.Y. 1995).

Here, it should have been obvious to Areu's counsel that her claims were legally frivolous for two simple reasons. First, her invocation of federal jurisdiction is patently frivolous, and nothing but a transparent attempt to inject her false allegations into Eckhart's unrelated federal suit. Areu does not assert any federal claims, and she cannot invoke supplemental jurisdiction because her state-law claims are completely unrelated to the sole federal claim of "sex-trafficking" asserted by Eckhart. And second, Areu was never an "employee" of Fox News. She was an unpaid guest. Her claim to be an "employee" is simply incredible, and thus her claims based on her purported employment status have no plausible basis.

### A. Areu Cannot Invoke Federal Jurisdiction

As this Court has recognized, "improperly invoking subject matter jurisdiction of a federal district court is sanctionable under Rule 11." *Wood v. Brosse U.S.A., Inc*., 149 F.R.D. 44, 48 (S.D.N.Y. 1993). Sanctions are appropriate where the plaintiff has "name[d] the Defendants in a bad faith attempt to gain a foothold in federal court." *New V & J Produce Corp. v. NYCCaterers Inc*., No. 13 CIV. 4861 ER, 2014 WL 5026157, at *8 (S.D.N.Y. Sept. 29, 2014).

That is exactly what Areu has done here, as she lacks any good-faith basis to invoke federal jurisdiction. She does not assert any federal claims, and instead relies solely on the contention that her state-law claims fall within the court's "supplemental jurisdiction." Compl. ¶ 41. That contention has no basis, however, because the only federal claim in the case is the sex-trafficking claim asserted by Eckhart, and that is completely unrelated to Areu's claims.

It is well established that supplemental jurisdiction extends only to state-law claims "that are so related to [the federal] claims in the action . . . that they form part of the same case or

controversy." *Blackrock Balanced Capital Portfolio v. HSBC Bank USA, Nat'l Ass'n*, 95 F. Supp. 3d 703, 708 (S.D.N.Y. 2015) (quoting 28 U.S.C. § 1367(a)). Federal and state claims form part of the same case or controversy only when they "'derive from a common nucleus of operative fact' and are such that one would ordinarily expect them to be tried in one judicial proceeding." *People ex rel. Abrams v. Terry*, 45 F.3d 17, 23 n.7 (2d Cir. 1995) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)).

The relationship between the two claims must not be defined at too high a "level of generality" because, "[a]t a sufficiently general level, everything is logically related to everything else." *Harry Winston, Inc. v. Kerr*, 72 F. Supp. 2d 263, 266 (S.D.N.Y. 1999). Properly understood, therefore, supplemental jurisdiction is appropriate only where "the facts underlying the federal and state claims substantially overlap[], or where presentation of the federal claim necessarily [brings] the facts underlying the state claim before the court." *Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 704 (2d Cir. 2000) (citation omitted). It is inappropriate "where the federal and state claims rest on essentially unrelated facts." *Blackrock*, 95 F. Supp. 3d at 708.

Here, it is frivolous to contend that this Court has supplemental jurisdiction over Areu's state-law claims. The only federal claim in this case is Eckhart's sex-trafficking claim under 18 U.S.C. § 1591. That claim turns on whether Fox News knowingly committed or benefited from facilitating a trafficking act, knowing Eckhart would be coerced to engage in a commercial sex act. *See id.* § 1591(a), (e)(4); *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 168-69 (S.D.N.Y. 2019). That federal issue pertaining to *Eckhart* has nothing to do with *Areu's* unrelated state-law claims. Indeed, resolution of the federal question will not "necessarily [bring] . . . before the court," *Lyndonville Sav. Bank & Trust Co.*, 211 F.3d at 704, Areu's baseless allegations that, for example, Kurtz invited her to his hotel "for sexual reasons," Compl. ¶ 127; that Carlson probed

to see if she was interested in a sexual relationship, *id.* ¶ 135; that Hannity publicly demanded that a man take her on a date for drinks, *id.* ¶ 140; or that Henry sent her "a slew of wildly inappropriate sexual images, messages[,] and videos," *id.* ¶ 145. Not only is there no "substantial[] overlap[]" between Eckhart's federal sex-trafficking claim and Areu's state-law claims; there is no overlap at all. *Lyndonville Sav. Bank & Trust Co.*, 211 F.3d at 704. The claims "involve vastly different and unrelated factual issues." *Figurowski v. Marbil Invs., LLC*, No. 14-cv-7034, 2015 WL 4000500, at *3 (E.D.N.Y. July 1, 2015). And no one "would ordinarily expect them to be tried in one judicial proceeding." *People ex rel. Abrams*, 45 F.3d at 23 n.7. It is thus beyond reasonable dispute that Areu's state-law claims have no place in federal court, and she and her counsel injected them into this suit solely for improper strategic purposes.

### B. Areu Was Not an "Employee" of Fox News

To assert her claims of workplace discrimination, Areu contends that she was an "employee" of Fox News and that she had a "part time employment relationship" with the company. Compl. ¶¶ 45, 124. But her claim to be an "employee" is frivolous as a matter of law. As both she and her counsel know, she appeared on Fox News solely as an unpaid guest. Affidavit of Christine Henry ¶¶ 2-3. She was thus not an employee, and her claim to the contrary is frivolous.

To qualify as an employee, a person "must establish that she received remuneration in some form for her work," which can be in the form of monetary payment or "substantial benefits not merely incidental to the activity performed." *United States v. City of New York*, 359 F.3d 83, 91-92 (2d Cir. 2004); *see also Farmer v. Shake Shack Enters.*, No. 19 CIV. 9425, 2020 WL 4194860, at *4 (S.D.N.Y. July 21, 2020) (noting the "antecedent requirement that an individual receive remuneration" is the "same test [that] has been applied under both the NYSHRL and the NYCHRL"). Merely incidental benefits, like travel to and from Fox News offices and the cost of

hair and make-up for television appearances, "fall short of the minimum level of significance or substantiality required to establish employee status in the absence of a salary." *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 445 (S.D.N.Y. 2018) (internal quotations omitted).

Here, however, Areu never even alleges that she received any substantial benefit from the company in exchange for her television appearances. She also does not allege any of the other hallmarks of an employment relationship such as supervision or control by the company—which, again, she could not possibly allege since she never did anything but appear on air as an unpaid guest. Henry Aff. ¶¶ 2-3. She thus does not have any claim to be an "employee," and it is frivolous for her to assert claims based on that clearly false premise.

Areu's counsel was well aware of this glaring legal problem before he brought this case. For one thing, Defendants informed him that Areu was only an unpaid guest and not an employee before he filed the complaint on her behalf. McKenna Decl. ¶ 9. And the Wigdor Firm already lost this very same argument in *Hughes*, where this Court held that an unpaid guest who appeared occasionally on Fox News was *not* an employee. *See* 304 F. Supp. 3d at 442-45 (holding that "a guest television contributor" is not an employee and is not covered by the workplace discrimination provisions of the NYCHRL or the NYSHRL).[5] *See also Doe v. Anonymous Inc.*, No. 18 CIV. 10924 (PAC), 2019 WL 2616904, at *3 (S.D.N.Y. June 25, 2019), *aff'd*, 794 F. App'x 129 (2d Cir. 2020) (holding under NYCHRL that where plaintiff was not an employee of defendant, "[p]laintiff's claims for gender discrimination, quid pro quo sexual harassment, hostile work environment, retaliation, and constructive discharge must fail").

---

[5] In their forthcoming motion to dismiss, Defendants will demonstrate that Areu's claims as a purported "applicant" for employment fail as a matter of law because (among other reasons) she never applied for a job with Fox News. But for present purposes, it is sufficient to note that her attempt to assert claims as an "employee" is not only wrong but frivolous, and thus sanctionable under Rule 11.

### III.     Areu's Frivolous Claims Are Geared to an Improper Purpose

Rule 11(b)(1) prohibits claims that are "presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." As the Second Circuit has noted, courts must exercise "vigilance" to ensure that litigation does not "become a vehicle for improper purposes." *Brown v. Maxwell*, 929 F.3d 41, 47 (2d Cir. 2019). Because the "legal process is already susceptible to abuse," courts must ensure that "[u]nscrupulous litigants" do not "weaponize" litigation to "humiliate and embarrass their adversaries" by "defam[ing] [them] in court pleadings or depositions without fear of lawsuit and liability." *Id.*

As a general matter, "the total lack of substance" of a plaintiff's claims itself "give[s] rise to the inference that the action was filed for improper purposes." *Abner Realty, Inc. v. Adm'r of Gen. Servs. Admin.*, No. 97 CIV. 3075 (RWS), 1998 WL 410958, at *7 (S.D.N.Y. July 22, 1998). That is especially true when a plaintiff asserts "baseless claims as part of a public relations campaign in order to embarrass the defendants and thereby coerce a settlement." *Galonsky v. Williams*, No. 96 CIV. 6207 (JSM), 1997 WL 759445, at *6 (S.D.N.Y. Dec. 10, 1997). Thus, using frivolous filings to "intimidate the defendant into a large settlement" is "an improper purpose under Rule 11(b)(1)." *Morley v. Ciba-Geigy Corp.*, 66 F.3d 21, 25 (2d Cir. 1995).

That is exactly what Areu and her counsel have done here. They filed, publicized, and refused to withdraw her frivolous claims in an effort to generate publicity, destroy Defendants' reputations, and extort a settlement. And even worse, they used Areu's frivolous allegations to generate extra publicity and increase the pressure for a settlement in Eckhart's completely unrelated case. This is a flagrant abuse of the justice system, and the Court should not tolerate it.

First, and most importantly, the frivolous nature of Areu's claims speak for themselves. As explained at length above, Areu's core factual allegations are not only knowingly false, but easily

disproved based on documentary evidence within her own possession and other irrefutable evidence that Defendants have since provided. If the Wigdor Firm did not know her claims were frivolous at the time of filing, it should have known through the most rudimentary investigation. And it certainly knew after Defendants sent the Wigdor Firm a Rule 11 letter along with a draft of this motion. In addition, Areu's claims are also legally frivolous because she has no basis to invoke federal jurisdiction or to claim status as an "employee" of Fox News. The total lack of legal and factual support for her claims thus "give[s] rise to the inference that the action was filed for improper purposes." *Abner Realty*, 1998 WL 410958, at *7.

Second, Areu's baseless claims were also plainly asserted for the improper purposes of generating publicity and trying to extort a settlement. When a complaint "lack[s] foundation in law or fact," then filing it "with a view to exerting pressure on defendants through the generation of adverse and economically disadvantageous publicity reflect[s] an improper purpose." *Sussman v. Bank of Isr.*, 56 F.3d 450, 459 (2d Cir. 1995). Accordingly, "it is appropriate to consider" the "press" generated "by counsel in assessing the issue of his good faith in filing frivolous claims." *Galonsky*, 1997 WL 759445, at *6. Here, as explained above, the Wigdor Firm used Areu's false claims in an effort to generate a multi-million dollar settlement. McKenna Decl. ¶¶ 8, 10. When that effort failed, her counsel stoked the flames of publicity by issuing a press release that not only repeated the false allegations from the complaint, but substantially embellished them with further falsehoods. Steele Aff., Ex. B. He thus "made good on [the] threat he had previously made to defense counsel . . . that unless defendants paid him," he would assert public allegations that would "cause [defendants] personal embarrassment" and serious reputational harm. *Galonsky*, 1997 WL 759445, at *3.

23

Finally, the improper purpose of generating false publicity was especially egregious here because Areu's counsel seized on her patently false and frivolous claims to heighten the publicity (and increase the pressure for a settlement) in the *unrelated* case of Eckhart, who was Wigdor's pre-existing client. As explained above, it was patently frivolous to include Areu's claims in this case, as they share nothing in common with Eckhart's federal "sex-trafficking" claim. The only reason for Wigdor to shoehorn Areu's false claims into Eckhart's unrelated federal complaint was to drag some of the network's biggest stars into the case and advance the false narrative of Fox News's "institutional apathy towards sexual misconduct." Compl. ¶ 2. Needless to say, that narrative otherwise would have refuted itself, since the company immediately suspended Henry as soon as it learned of Eckhart's allegations, and then investigated and fired him in less than a week.

## IV. Dismissal and Monetary Sanctions Are Appropriate

Rule 11 permits a sanction of dismissal "for serious misconduct when lesser sanctions would be ineffective or are unavailable." *Safe-Strap Co. v. Koala Corp.*, 270 F. Supp. 2d 407, 418 n.8 (S.D.N.Y. 2003) (internal quotations omitted); *see also Murray v. Dominick Corp. of Can., Ltd.*, 117 F.R.D. 512, 516 (S.D.N.Y. 1987) ("Rule 11 provides . . . grounds for the sanction of dismissal of the complaint"). The Court is likewise authorized to enter "an order directing payment to the movant of part or all of the reasonable attorneys' fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4). Such an order can encompass the fees and costs a party incurs for filing the Rule 11 motion, as well as the fees and costs of litigation that "the parties would have avoided" had the plaintiff "withdrawn [her] claims . . . when it was 'patently clear' that there was no evidence to support them and [when] [s]he knew [the defendant] intended to seek Rule 11 sanctions." *Galin*, 283 F. Supp. 3d at 204.

Here, both dismissal and monetary sanctions are appropriate. First, the Court should dismiss all of Areu's claims with prejudice, as that is the only way to end the Rule 11 violation by stopping her from pursuing her frivolous claims. And second, the Court should require Areu to reimburse the attorneys' fees and costs that Defendants have incurred in connection with this motion, as well as all other fees and costs that Defendants have been forced to incur to defend themselves against her malicious fabrications.

## CONCLUSION

For the foregoing reasons, the Court should impose Rule 11 sanctions.

Dated:   August    , 2020

<div style="margin-left: 40%;">

By:     _____

Kathleen M. McKenna, Esq.
Lloyd B. Chinn, Esq.
Keisha-Ann G. Gray, Esq.
Danielle J. Moss, Esq.
Yonatan L. Grossman-Boder
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036-8299
(212) 969-3000
kmckenna@proskauer.com

Anthony J. Dick
Ariel N. Volpe
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
Tel. (202) 879-3939
Fax. (202) 879-1700
E-mail: ajdick@jonesday.com

*Attorneys for Defendants*
*Fox News Network, LLC, Sean Hannity,*
*Tucker Carlson, and Howard Kurtz*

</div>

# EXHIBIT D

K8s1eckc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
JENNIFER ECKHART and CATHY AREU,

                    Plaintiffs,

          v.                              20 Civ. 5593 (RA)

FOX NEWS NETWORK, LLC, ED HENRY,
et al.,
                                          Status Conference
                    Defendants.           (Via Teleconference)
------------------------------x
                                          August 28, 2020
                                          10:00 a.m.

Before:

                    HON. RONNIE ABRAMS,
                                          District Judge

                         APPEARANCES

WIGDOR LLP
     Attorneys for Plaintiff Jennifer Eckhart
BY:  MICHAEL J. WILLEMIN, ESQ.

VALLI KANE & VAGNINI, LLP
     Attorneys for Plaintiff Cathy Areu
BY:  JAMES VAGNINI, ESQ.
     SARA W. KANE, ESQ.
     MATTHEW L. BERMAN, ESQ.
     ROBERT VALLI, ESQ.

PROSKAUER ROSE LLP
     Attorneys for Defendants Fox, Hannity, Carlson, Kurtz
BY:  KATHLEEN M. McKENNA, ESQ.
     LLOYD B. CHINN, ESQ.

MORVILLO, ABRAMOWITZ, GRAND, IASON, & ANELLO P.C.
     Attorneys for Defendant Ed Henry
BY:  CATHERINE FOTI, ESQ.
     ELKAN ABRAMOWITZ, ESQ.
     DOUGLAS CHALKE, ESQ.

SALE & WEINTRAUB, P.A.
     Attorneys for Defendant Ed Henry
BY:  JAYNE WEINTRAUB, ESQ.

K8s1eckc

| | |
|---|---|
| 1 | (Case called) |
| 2 | THE COURT:  If counsel for plaintiff could please |
| 3 | state their appearances. |
| 4 | MR. WILLEMIN:  This is Michael Willemin from Wigdor |
| 5 | LLP.  I'm joined by my colleague Renan Varghese, who will be |
| 6 | muted, and we represent plaintiff Jennifer Eckhart. |
| 7 | THE COURT:  All right.  Good morning to you. |
| 8 | MR. WILLEMIN:  Good morning, your Honor. |
| 9 | MR. VAGNINI:  Good morning, your Honor.  This is James |
| 10 | Vagnini and I'm with Matthew Berman, on behalf of Catherine |
| 11 | Areu, as well as my partners Sara Kane and Robert Valli, who |
| 12 | will be muted. |
| 13 | THE COURT:  All right.  Good morning to you as well. |
| 14 | MR. VAGNINI:  Good morning. |
| 15 | THE COURT:  I have of course granted that motion to |
| 16 | substitute counsel. |
| 17 | And yes, for defendants, please? |
| 18 | MS. McKENNA:  Yes, your Honor.  This is Kathleen |
| 19 | McKenna from Proskauer Rose.  I am joined by my partner Lloyd |
| 20 | Chinn.  We represent Fox News Network, LLC, Tucker Carlson, |
| 21 | Sean Hannity, and Howard Kurtz. |
| 22 | THE COURT:  All right.  Good morning to you. |
| 23 | COUNSEL:  Good morning, your Honor. |
| 24 | MS. FOTI:  Your Honor, this is Catherine Foti from the |
| 25 | law firm of Morvillo, Abramowitz, Grand, Iason, & Anello, |

K8s1eckc

1  representing Ed Henry.  My partner Elkan Abramowitz is also

2  appearing, as well as an associate Douglas Chalke; and my

3  co-counsel Jayne Weintraub is also on.

4          THE COURT:  All right.  Good morning to all of you as

5  well.

6          COUNSEL:  Good morning.

7          THE COURT:  All right.  So first of all, I just want

8  to remind everyone that this is a public line.  It's available

9  to the press and the public.  No recordings are permitted.

10         I've reviewed your letters and the proposed case

11 management plan, and of course the complaint.  But since we're

12 meeting for the first time, if any of you would like to tell me

13 anything else about the case or like to be heard, I'm happy to

14 hear you out.  If not, we'll talk about scheduling.

15         MR. WILLEMIN:  This is Michael Willemin on behalf of

16 Ms. Eckhart.

17         I don't know if your Honor has any specific questions.

18 We certainly don't feel the need to recite what's laid out in

19 the complaint, so nothing further from us unless you have any

20 questions you'd like answered.

21         THE COURT:  I don't.  I don't.  Thank you.

22         MR. VAGNINI:  Same here, your Honor.  James Vagnini on

23 behalf of plaintiff Areu.

24         THE COURT:  Okay.  And from the defendants'

25 perspective?

K8s1eckc

| | |
|---|---|
| 1 | MS. McKENNA:  Your Honor, this is Kathleen McKenna for |
| 2 | the Fox News Network defendants. |
| 3 | I'm a little surprised and puzzled, I guess, by the |
| 4 | silence from plaintiffs' counsel, since we had received inquiry |
| 5 | from plaintiffs last night with respect to our consenting to |
| 6 | their request to sever Ms. Areu from Ms. Eckhart.  If there |
| 7 | isn't going to be an application to sever, then we needn't |
| 8 | concern ourselves because I think, as your Honor knows, on |
| 9 | Wednesday evening, after the Fox defendants had opposed the |
| 10 | request for an extension of the 21 days for Rule 11 withdrawal, |
| 11 | the Wigdor firm had filed a five-page, single-spaced, publicly |
| 12 | filed letter opposing the defendants' Rule 11 motion that we |
| 13 | have not yet permitted to file, and that opposition did not |
| 14 | accurately represent the defendants' motion, and asking whether |
| 15 | or not there would be a severance.  Obviously the defendants |
| 16 | don't think there should be a severance, but we don't think |
| 17 | these two plaintiffs should be joined together, as we indicated |
| 18 | to the Wigdor firm when we sent our Rule 11 motion.  Ms. Areu's |
| 19 | factual allegations are false; they were known to her to be |
| 20 | false when she filed it; they were knowable to be false by the |
| 21 | Wigdor firm.  They nevertheless filed the complaint and |
| 22 | publicly reported on it.  There is no legal basis for it to be |
| 23 | filed because Ms. Areu doesn't have a single federal claim. |
| 24 | That plus the backdrop of how the matter came to be filed |
| 25 | convinces the defendants that the Wigdor firm had stitched |

K8s1eckc

1    these two clients together for an improper purpose, and it was

2    for that reason that we filed the robust Rule 11 motion on

3    August 7th.

4         We now find ourselves in a posture where this is sort

5    of like a hit-and-run accident, your Honor, and we need sort of

6    your help here.  We don't think the two plaintiffs should be

7    joined together because it's the position of the Fox defendants

8    that Ms. Areu doesn't have a factual or legal basis to be

9    before you at all.  Of course if it were severed, there would

10   be no -- as of today, there would be no basis for a federal

11   jurisdiction and the case would have to be dismissed today.

12   But whether or not the matter is continued or severed, it is

13   the position of the Fox defendants that plaintiff and her

14   counsel, the Wigdor firm, abused Rule 11, and the defendants

15   are going to maintain their right to seek sanctions under

16   Rule 11 against Ms. Areu and Wigdor for its actions when the

17   Wigdor firm was of counsel.  Defendants very strongly feel,

18   your Honor, that they have the right to hold plaintiff and her

19   counsel accountable for the very public damage that's been done

20   to the company and its public personalities under the cloak of

21   judicial privilege.

22        And as we also foreshadowed in the preliminary

23   scheduling letter to you, it is the intention of the

24   defendants, separate and apart from the Rule 11 filing, to file

25   a motion to dismiss both as it relates to Ms. Eckhart and to

K8s1eckc

1    Ms. Areu.  I wanted to disclose to your Honor the recency of

2    the communications with plaintiffs on the status of this.

3               THE COURT:  Thank you for that.

4               You won't be surprised to hear I'm obviously not going

5    to decide a motion for sanctions without full briefing on the

6    issue, but I do want to hear plaintiffs out on the notion of

7    severance, that piece.

8               MR. VAGNINI:  Yes, your Honor.  This is James Vagnini.

9    I can address that.

10              So we have discussed that as an issue.  First and

11   foremost, we will be responding by the deadline you have given

12   us to respond with an amended complaint, which will address all

13   of the issues that defendants have raised, including

14   jurisdiction issues.  We do believe there's a Title VII claim

15   for Ms. Areu.  Pending -- the EEOC request for the right to sue

16   letter is pending.  We have filed numerous actions in a similar

17   fashion and for purposes of --

18              THE COURT:  Can I stop you there, actually.

19              MR. VAGNINI:  Sure.

20              THE COURT:  I did want to hear about the timing with

21   respect to the EEOC.  Do you have a sense of the status of

22   those claims and any sense of timing?  And that question

23   applies to both plaintiffs.

24              MR. VAGNINI:  Sure.  For plaintiff Areu, we have been

25   in touch with the EEOC.  They're processing our request for the

K8s1eckc

```
 1    right to sue letter, and in our experience for decades now,
 2    once EEOC is aware there's litigation pending, it's an
 3    automatic process to issue the right to sue so there's not a
 4    duplication of efforts and work.  So we do hopefully expect to
 5    have -- I would like to have it by the time we amend the
 6    complaint, your Honor, but it may be shortly after that.
 7              MS. FOTI:  Your Honor, if I can interrupt.  I'm very
 8    sorry.  For some reason I was kicked off about a minute ago so
 9    I'm sorry, I just missed what happened after -- I heard
10    Ms. McKenna, what she said, but I didn't hear what was said
11    after that.
12              THE COURT:  Okay.  If you could actually just repeat
13    what was said.
14              I was asking about timing with respect to the EEOC
15    claims, but if, counsel, you can repeat what you said.
16              MR. VAGNINI:  Sure.
17              We would like and expect to hopefully have the right
18    to sue letter by the time our amendment is filed.  If not, I
19    would anticipate a few weeks after that.  Generally when EEOC
20    is aware that there's pending litigation, they expedite, you
21    know, the issuance of the right to sue letter so as not to
22    duplicate efforts, knowing that a plaintiff is already pursuing
23    claims in court.
24              Separate and apart from that, your Honor, I want to
25    note that there is also diversity jurisdiction on behalf of
```

K8s1eckc

 1   Ms. Areu, at least.  She's a resident of Florida, not New York.

 2   So in the event there were a separation, we would believe we

 3   would meet the diversity requirements for federal jurisdiction

 4   as well, but that's something Mr. Willemin and I have

 5   discussed.  We do think it might be best at some point to

 6   have -- we were essentially waiting until the amended complaint

 7   and then discussed this issue of separating the cases out while

 8   at the same time, you know, not wasting defendants' time or

 9   your time, your Honor, in elaborating and having to join

10   discovery schedules, keeping to the same deadline, so there

11   will be some overlap, but as the defendants have noted, there

12   are claims that Ms. Areu has that have nothing to do with

13   plaintiff Eckhart's and vice versa.  So that is something we do

14   intend to raise with you at some point.  I thought it would be

15   clearer once we amended the complaint, but we're happy to

16   address that now as well.

17           THE COURT:  Okay.  So you'd rather talk about the

18   issue of severance after the filing of the amended complaint,

19   but you're prepared to talk about it now?  I just want to make

20   sure I'm on the same page.

21           MR. WILLEMIN:  Your Honor, this is Michael Willemin

22   from Wigdor.

23           I don't know that that's what Mr. Vagnini intended,

24   but I will say that from Ms. Eckhart's perspective, it's our

25   view that, given that counsel has now been substituted, that

K8s1eckc

1  the cases should be severed, if your Honor is amenable to that,

2  prior to the filing of the amended complaint, because the

3  amended complaint is going to necessarily -- if we don't sever,

4  then it's necessarily going to be a two-plaintiff complaint,

5  and I don't intend to have Ms. Eckhart amend her claims until

6  we receive whatever -- if at all -- until we receive whatever

7  responsive pleadings we get.

8          THE COURT:  The EEOC notice of right to sue?

9          MR. WILLEMIN:  Well, right to sue --

10         THE COURT:  Sorry.  Go ahead.

11         MR. WILLEMIN:  No.  The right to sue, actually -- I

12  mean, if there's a motion to dismiss with respect to

13  Ms. Eckhart's claims, we just want to make sure we've preserved

14  our ability to amend as of right, so I'd rather not have a

15  second filing with a two-plaintiff case if we're going to sever

16  it anyway and complicate that.  I'd rather just sever it now.

17         And Ms. Eckhart has federal jurisdiction.  I'm not

18  going to respond to the stuff that Ms. McKenna said because I

19  don't think it's fruitful, but I do think it's important to

20  note, as Mr. Vagnini said, that Ms. Areu has diversity

21  jurisdiction in this case.  So the idea that we lack -- that we

22  combined these cases for some improper purpose is just based on

23  a total -- I mean, it's just wrong, but it's also based on the

24  false assumption that Ms. Areu couldn't have brought her own

25  federal case.  She could have brought her own federal case.  I

K8s1eckc

1    thought the cases were appropriate to be brought together given

2    the significant overlap in claims with relation to Mr. Hannity.

3            So in any event, that's just the only thing that I'll

4    respond to, because the rest I didn't think merited response.

5            THE COURT:  So Mr. Vagnini, let me go back to you.  Do

6    you have any objection to severing the two cases?  I'll let you

7    know that even if I were to sever the cases, I would keep them

8    both as related cases and, to the extent that they move to

9    discovery, would have them on parallel tracks.

10            MR. VAGNINI:  Then we have no objection to that, your

11    Honor.

12            THE COURT:  All right.  And can I hear from defense

13    counsel with respect to the motion to sever.

14            Ms. McKenna, I think you said you consented to that,

15    but I want to confirm that.

16            MS. McKENNA:  Oh, and I did not, your Honor.

17            THE COURT:  Okay.  I'm sorry that I misheard you.

18            MS. McKENNA:  That's okay.  I'm sure it was my fault.

19            The problem with severing, your Honor, is that it

20    suggests that we think that these claims were properly brought

21    in the first place.  Areu does not belong in federal court.

22    One, she does not have currently a Title VII action; and

23    irrespective of Mr. Vagnini's representations that a charge has

24    been filed -- I accept the representation that the charge has

25    been filed, although we have not received it -- we do not

K8s1eckc

1  believe that the EEOC now could issue a right to sue.  And the

2  courts have dismissed federal claims under Title VII when the

3  administrative remedies under the act were not exhausted, as

4  they would not be if a right to sue letter is going to be

5  issued in the imminent future.

6      Second, with respect to Mr. Vagnini's representation

7  that there's diversity jurisdiction, that surprises us, because

8  the complaint says that Ms. Areu is a New York resident.  If

9  there's been a change in her residency, we can address whether

10  or not there's complete diversity here, but that's not what the

11  complaint says.

12      With respect to Ms. Eckhart, I am not surprised that

13  the Wigdor firm would be happy to see a severance because the

14  more they can distance themselves from the false things that

15  were said, factually and legally in the complaint, the better

16  for them under Rule 11.

17      Rule 11, we know, your Honor, is a very serious motion

18  to make -- very serious -- and we have been scrupulous about

19  not revealing to the Court, not presenting to the Court under

20  Rule 11, because we are not allowed to, the basis for our

21  Rule 11 motion until the expiration of the 21 days.

22  Notwithstanding that, on two occasions -- in the initial

23  scheduling order to your Honor and in the letter filed

24  Wednesday evening -- the Wigdor firm has purported to argue

25  this motion incompletely and inaccurately.  We want to preserve

K8s1eckc

 1    our right, your Honor, to file our Rule 11, because as I am

 2    hearing Mr. Willemin, he has no intention of amending his

 3    complaint and wants to pass the hot potato to Mr. Vagnini.  If

 4    Mr. Vagnini wishes to accept the hot potato, Ms. Areu, that is

 5    okay, but we want to be very clear that both counsel are going

 6    to be on the hook for what gets said in the current complaint

 7    and the first amended complaint, and so long as the defendants

 8    are not seen as waiving their right to move under Rule 11

 9    against Ms. Areu and against her counsel, we leave it to your

10    Honor to manage the docket.

11             THE COURT:  All right.  I'm happy, Ms. Foti, or

12    Mr. Abramowitz, if you want to be heard on the severance issue

13    and how that may affect a Rule 11 motion.  I'm happy to hear

14    you out on that.

15             MS. FOTI:  Your Honor, yes.  It's Catherine Foti.

16             First of all, Mr. Henry denies the allegations, all

17    allegations from both plaintiffs.

18             We don't take a position on whether or not it should

19    be severed.  We leave that up to your Honor's discretion.  But

20    our concern is that Mr. Henry has been -- his reputation has

21    been seriously damaged.  He, you know, needs to get his life

22    back on track.  And we believe discovery will show that these

23    allegations are false, so we are anxious to go forward with

24    discovery.  And to the extent there's a limitation because of

25    the need to amend Ms. Areu, you know, we would object to any

K8s1eckc

| | |
|---|---|
| 1 | change in the case management plan other than what we've agreed |
| 2 | to, which was pushing out discovery demands until |
| 3 | September 11th.  We would reject any further delays, or object |
| 4 | to any further delays in getting discovery on track.  So we |
| 5 | leave it to your Honor to manage that, but that is our |
| 6 | position. |
| 7 | THE COURT:  But Mr. Henry also plans to file a motion |
| 8 | to dismiss with respect to both plaintiffs, correct? |
| 9 | MS. FOTI:  That is correct, your Honor.  We have |
| 10 | various motions to dismiss -- failure to state claims, statute |
| 11 | of limitations.  That said, we understand the delay in terms |
| 12 | of, you know, filing motions to dismiss, especially in, you |
| 13 | know, a case like this, and Mr. Henry is being prejudiced, and |
| 14 | there is in fact certainly an understanding that under Rule 26, |
| 15 | discovery should go forward unless there is a basis for a stay |
| 16 | established, and the plaintiffs agree that discovery should go |
| 17 | forward notwithstanding the motion to dismiss, so we think |
| 18 | discovery should go forward. |
| 19 | THE COURT:  I understand.  I mean, my understanding is |
| 20 | that the Fox News defendants believe that there should be a |
| 21 | stay pending resolution of the motions to dismiss.  Is that |
| 22 | correct, Ms. McKenna? |
| 23 | MS. McKENNA:  Yes, your Honor, very strongly. |
| 24 | THE COURT:  Okay.  Let me just go back to plaintiffs' |
| 25 | counsel. |

K8s1eckc

If I were to sever the two cases, what's your position with respect to how that would affect the Rule 11 motion, if at all?

MR. WILLEMIN:  Your Honor, this is Michael Willemin from Wigdor.

I don't think that the severance impacts the Rule 11 motion.  I mean, we laid out our position in the letter that we sent in on Wednesday evening.  I will note that all -- to what Ms. McKenna said is true.  A Rule 11 motion is a very serious motion, and this one was done with such flippancy, it's unbelievable.  The motion is groundless.  It's not been misrepresented in the letter we sent to the Court, as your Honor will see when the motion is actually filed.  Ultimately, I don't believe that the motion can be made against the Wigdor firm for the reasons that we laid out.  My hands literally are tied now.  This is not a situation where I got a Rule 11 motion, dumped the client and said, I don't want to deal with this anymore; this is a situation where we got a Rule 11 motion, I felt very strongly it was frivolous, I was in the process of filing an amended complaint to add a claim of retaliation against Fox for sending the Rule 11 motion, and then my client retained other counsel.

The Rule 11 process requires that any individual or firm that's the subject of a Rule 11 motion have the safe harbor period.  In this case, I don't have the safe harbor

K8s1eckc

period.  Our firm doesn't have the safe harbor period.  So we
don't think, whether the cases are severed or not, that the
motion can be filed against us.  If Ms. McKenna really
believes -- which I don't think she does, but if she really
believes that we intentionally filed frivolous litigation
knowing that it was false, she can take that up with the
disciplinary committee.  But she can't, in my view, take that
up under Rule 11 because the procedural requirements and due
process won't be met.  So in our view, it can't be made against
us regardless of whether it's severed.

However, I would concede that if your Honor is of the
view that it can be made against us or somehow can be granted
against us, notwithstanding what I've just laid out, I don't
think that severance -- I'm not trying to sever the case to
save myself.  I think severance makes sense in the case, and I
don't think that just because I sever it, I'm off the hook for
what was on the original complaint, which was completely
properly pled.  So I don't think severance impacts the Rule 11
motion, but I think it can't be made against us for other
reasons.

THE COURT:  All right.  So I'm going to go back to
you, Ms. McKenna.  Given what Mr. Willemin just said and what
I'm hearing him to say, that whether or not the case is severed
shouldn't play into the decision with respect to the Rule 11
motion, do you have any objection to severance?

K8s1eckc

1          MS. McKENNA:  We have an objection to severance only,

2     your Honor, if it means that the Areu case continues before

3     you, because if it's severed today, there's no federal

4     jurisdiction and her claims should be dismissed.

5          And further, your Honor, it is the position -- I don't

6     want to mislead the Court.  It is the position of the Fox

7     defendants, notwithstanding what Mr. Willemin said, that they

8     cannot engage in the hit-and-run tactics they engaged in here.

9     They cannot publicly file bold statements, then say, uh, I'm

10    not the counsel anymore, I'm not responsible.

11         THE COURT:  Okay.

12         MS. McKENNA:  So the Fox defendants will be seeking

13    relief before your Honor.  If your Honor is going to sever them

14    today, then it seems to me Ms. Areu has to be dismissed,

15    because we have no basis for federal jurisdiction.

16         THE COURT:  All right.  So I'm not going to sever them

17    today.  It seems like there are issues that need to be sorted

18    out.  I have already granted Ms. Areu until September 11th to

19    amend her complaint, and particularly in light of the fact that

20    her counsel has asserted that there's also diversity

21    jurisdiction, I want to wait and see what that amended

22    complaint looks like.

23         MS. McKENNA:  Understood, your Honor.

24         THE COURT:  So I think that that's the best course of

25    action.  We'll get the amended complaint.  I'm not going to

K8s1eckc

```
1    sever the cases today.  And when you get it, I'm happy to have

2    another conference or I'm happy for you all to respond to the

3    complaint at that time.  I mean, I also think, frankly, it

4    makes sense to get the amended complaints and see where we are

5    with respect to severance before I decide on a stay.  So I

6    think we need to do things one step at a time, and I think that

7    that's what makes most sense.

8               Does anyone else want to be heard on that?

9               So we're going to wait until September 11th; we're

10   going to get the amended complaint.  Do you want to have a

11   conference after that, or should I have a conference after I

12   get the responsive pleadings?

13              MR. WILLEMIN:  Your Honor, this is Michael Willemin

14   from Wigdor.

15              I have no problem with that plan, and I think we

16   should have -- my view, we should have a conference after the

17   responsive pleadings come in, although I'm open to either way.

18   My only two questions about the plan are:  (A) is there going

19   to be essentially an effective stay at this point, meaning

20   we're not going to turn over initial disclosures or be

21   permitted to serve discovery requests; and (B) -- well, I guess

22   the other issue is that if there's an amended complaint.

23              THE COURT:  So the answer to that is yes, until we

24   meet again to address these issues, because I have before me

25   pending a request to stay discovery.  So the answer to the
```

first question is yes.  And your second question?

MR. WILLEMIN:  Yes.  The second question is, if the amended complaint gets -- I understand your Honor's rules, generally speaking, require or provide for a certain time period after receipt of a motion to dismiss to indicate to the other side whether an amendment is going to be made, and if this complaint gets amended as a two-plaintiff complaint, given that Ms. Eckhart wouldn't want to amend it at this time, I just want to make sure that we're not going to be waiving our right to have that amendment following the receipt of a motion to dismiss if there are any additional allegations we need to add to address any arguments made in the motion to dismiss.

THE COURT:  That's correct; you will not be waiving that right.

MR. WILLEMIN:  Thank you.

MS. FOTI:  Your Honor, Catherine Foti.

THE COURT:  Yes.

MS. FOTI:  Could I just request, respectfully, an amendment to the temporary stay.  Again, Mr. Henry is undergoing tremendous difficulties in terms of, you know, the assault on his reputation here.  The gentleman needs to get his life back, needs to get his reputation back, needs to get a job.  I certainly understand what you're saying about the, you know, stay pending, request for a stay, but my question is whether or not we could at least go forward with requests for

K8s1eckc

```
1    documents and requests for interrogatories without requiring an

2    actual production of documents or even response; at least get

3    those things out, exchanged, so that, you know, when the

4    amendment comes in, we can hit the ground running, really.  I'm

5    just telling you, this is a real burden on Mr. Henry, not

6    even -- in terms of process here, he's ready to respond to both

7    plaintiffs, and he's ready to engage in discovery on this with

8    both plaintiffs.

9              THE COURT:  Right.  But he's also filing a motion to

10   dismiss.  I fully appreciate his desire to move this case along

11   as soon as possible, and I'll commit to you that I'll try and

12   move this case along as quickly as I can as well, but I really

13   don't think that makes sense.  I think it makes more sense to

14   get the amended complaints and see where we are.  As I said,

15   what I am flexible about is when we meet again.  If we meet

16   again after I get the responsive pleadings, which probably

17   makes more sense because one of the factors that plays into a

18   request for a stay is, you know, the strength of the

19   dispositive motions, so I think, frankly, I'll be in a better

20   position to assess that after I receive the motions.  So I

21   think what should happen is, we'll get the amended complaint on

22   September 11th, we'll get the responsive pleadings, and I'll

23   have a conference promptly after that.  If anyone wants to

24   submit anything in writing with respect to the requests for the

25   stay, you're welcome to do so.  It's not necessary.  I feel
```

K8s1eckc

1    like I have an understanding, based on the information I've

2    received so far, as to your positions as to why a stay is or is

3    not necessary and appropriate in this case.  But that's what I

4    think the best way to proceed is.  So I'm going to deny that

5    request.

6              MS. FOTI:  All right.  Thank you, your Honor.

7              THE COURT:  Are there any other applications?

8              Yes, please.

9              I'm sorry.  Who would like to be heard?

10             MS. FOTI:  I was just saying thank you, your Honor,

11   for hearing me out before.  That's all.

12             THE COURT:  All right.

13             MR. VAGNINI:  Your Honor, this is James Vagnini.

14             THE COURT:  Yes.

15             MR. VAGNINI:  I agree completely with that plan.  It

16   makes sense, particularly since we'll be amending and -- we

17   will be amending.

18             I also just want to clarify as to some references -- a

19   lot of things have been said that are inflammatory.  I'm not in

20   the business of lawyer bashing in any way, shape, or form, and

21   the reference to Wigdor passing my client over as a "hot

22   potato," to the extent it indicates that there's something

23   wrong, that's the furthest thing from the truth.  Ms. Areu has

24   a right to obtain counsel in this situation, and I absolutely

25   understand why it should be no reflection on what the Wigdor

K8s1eckc

1    firm filed, has done, and I just take note that those types of

2    comments on the line like this is to me inappropriate.

3              THE COURT:  All right.  Thank you.

4              Anything else?

5              Mr. Willemin, is there anything else you wanted to say

6    today?

7              MR. WILLEMIN:  No, your Honor.

8              THE COURT:  Okay.  So just to be clear, I'm not

9    entering the case management plan today.  I'm going to get an

10   amended complaint by September 11th, and I will hold a

11   conference promptly after receiving the responsive pleadings to

12   that amended complaint, and then I will promptly decide the

13   issue with respect to severance, to the extent that request is

14   still being made, and with respect to the request to stay

15   discovery pending the motions to dismiss that are anticipated.

16   And then we'll move on from there.  I understand that we have

17   the Rule 11 motion as well.  But that's where we are.

18             Thank you all for participating today by telephone,

19   and stay safe, everyone.

20             ALL COUNSEL:  Thank you, your Honor.

21                            o0o

22

23

24

25