L7K5areA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CATHY AREU,

                    Plaintiff,                    New York, N.Y.

          v.                                      20 Civ. 8678 (RA)

FOX NEWS NETWORK, LLC,
ED HENRY,
TUCKER CARLSON,
HOWARD KURTZ,
SEAN HANNITY,

               Defendants.

------------------------------x

                                                  July 20, 2021
                                                  2:10 p.m.

Before:

                    HON. RONNIE ABRAMS,

                                                  District Judge

                         APPEARANCES


VALLI, KANE & VAGNINI, LLP
     Attorneys for Plaintiff
BY:  ROBERT J. VALLI, JR.
BY:  MONICA HINCKEN

PROSKAUER ROSE, LLP
     Attorneys for Defendants Fox News, Carlson, Kurtz, and
Hannity
BY:  KATHLEEN M. McKENNA
BY:  YONATAN GROSSMAN-BODER

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO, PC
     Attorneys for Defendant Henry
BY:  CATHERINE FOTI
BY:  DOUGLAS CHALKE

L7K5areA

```
1            (Case called)
2            THE DEPUTY CLERK:  Counsel, please state your name for
3    the record.
4            MR. VALLI:  It is Robert Valli, from Valli, Kane &
5    Vagnini, along with Monica Hincken.  Good afternoon, your
6    Honor.
7            THE COURT:  Good afternoon.  I am going to ask
8    everyone to speak into the microphones, please.
9            MR. VALLI:  I apologize.  It is Robert Valli, from
10   Valli, Kane & Vagnini, along with Monica Hincken, for plaintiff
11   Areu.
12           THE COURT:  Good afternoon.
13           MS. McKENNA:  Kathleen McKenna, Proskauer Rose, LLP,
14   along with my colleague Yonatan Grossman-Boder.
15           THE COURT:  Good afternoon.
16           MS. FOTI:  Good afternoon, your Honor.  Catherine Foti
17   from Morvillo, Abramowicz, Grand, Iason & Anello for defendant
18   Ed Henry, along with my colleague Douglas Chalke.
19           THE COURT:  Good afternoon.
20           As I think my law clerk mentioned to you, if you are
21   vaccinated and you would like to take off your mask when you
22   are in the well of the courtroom, you are free to do so.  I'm
23   going to do that as well.  And, as a precaution, if you are
24   within six feet, do keep it on when you are not speaking.
25           So, we have a number of motions today.  What would you
```

L7K5areA

1    recommend in terms of who would like to be heard first?  Would

2    Fox like to be heard first, then Mr. Henry, and then

3    plaintiffs?

4              MS. McKENNA:  Yes.

5              MR. VALLI:  That's fine with plaintiff, your Honor.

6    I'm not sure what the defendant's position is.

7              THE COURT:  That's fine with me.  I didn't know if you

8    wanted to break it up in terms of the motions to dismiss or the

9    sanctions motions, but I'm happy to proceed as would you like

10   to.  But, why don't we get started with Fox on the motion to

11   dismiss.

12             MS. McKENNA:  Thank you, your Honor.  May we stay at

13   counsel table and seated or do you prefer --

14             THE COURT:  Whatever your preference is.  All that

15   matters to me is you use the microphone.  Thank you.

16             MS. McKENNA:  Thank you, your Honor.

17             Your Honor, Fox News Network respectfully suggests

18   that Cathy Areu's claims are subject to a motion to dismiss

19   both because this Court lacks jurisdiction to consider her

20   claims and because they fail substantively; her claims of

21   sexual harassment and retaliation fail as a matter of law.

22             With respect to her jurisdiction, as the Court will

23   recall, Ms. Areu originally appended her claims to

24   Ms. Eckhart's sex trafficking claims despite the fact that they

25   were completely unrelated -- not substantively let alone

L7K5areA

1    substantially substantively.  She then tried to allege that

2    there was diversity jurisdiction, your Honor.  There has never

3    been diversity jurisdiction in this case.  In her original

4    complaint she said that she was a citizen of New York but

5    acknowledged that in fact so was Fox News and so was Sean

6    Hannity.  In her amended complaint, she alleges now that she is

7    a citizen of Florida but, again, so is Tucker Carlson.  She has

8    essentially conceded that there is no diversity jurisdiction

9    and therefore she is left to rely on federal question

10   jurisdiction under her claims under Title VII and her filing

11   with the EEOC.  As your Honor is aware, it is the view of Fox

12   that the early issued right to sue letter by the EEOC was

13   inappropriately issued in contravention of the statute.  She

14   filed her EEOC charge sometime in July or August of 2020, 180

15   days for consideration, as required under the statute, would

16   not elapse until January or February of 2021.

17            THE COURT:  So, let me just stop you there.

18            MS. McKENNA:  Yes, your Honor.

19            THE COURT:  So, we are past January or February 2021.

20   Assuming arguendo I were to agree with you on this point, is it

21   mooted now?  Would she have to go back and get another right to

22   sue letter, from your perspective, or need she just, if I were

23   to give her leave to amend complaint, would that cure the

24   problem, from your perspective?

25            MS. McKENNA:  It would not, your Honor.  The statute

L7K5areA

1    requires that the EEOC have considered it for the 180-day

2    period.  When she filed that had not yet happened.  Under the

3    decision which we think was correctly reasoned in *Gibb v.*

4    *Tapestry*, the Court has to dismiss it and send her back to the

5    EEOC.

6            THE COURT:  And, from your perspective, Hernandez was

7    wrongly decided?

8            MS. McKENNA:  Yes, your Honor.  In fact, I think the

9    rationale for *Hernandez*, I think the *Gibb* case was correct

10   because if *Hernandez* is correct, it effectively reads the

11   requirement of the statute out of the statute which we, and the

12   Court in *Gibb*, thought was inappropriate.

13           Since there is no federal question for the Court,

14   neither under diversity nor under Title VII, perforce there

15   could be no supplemental jurisdiction since there is no

16   original jurisdiction.  Ms. Areu's claims, under state and city

17   law drop out, and should not be before the Court.

18           In any event, as your Honor is aware, it is the view

19   of Fox News that, as a substantive matter, Ms. Areu is not

20   legally entitled and has failed to state a hostile work

21   environment claim.  She can't bring such a claim because she

22   was never an employee of Fox News and she is not a covered

23   non-employee under state and city statute.  And as I will turn

24   to in a moment, as a substantive matter, the allegations she

25   makes with respect to Mr. Carlson, Mr. Hannity, and Mr. Kurtz,

L7K5areA

1    and Mr. Caldwell, don't constitute a hostile work environment.

2              THE COURT:  If I were to grant leave to amend do you

3    think she could adequately allege an implied contract with Fox

4    News such that she would be considered a covered non-employee

5    under the state and city law?

6              MS. McKENNA:  I don't think so, your Honor.  First of

7    all, she did admit in her original complaint that she never had

8    a contract.  It would not be a mystery to me if Ms. Areu, in an

9    amended complaint, made an allegation completely contrary to

10   her original complaint but I don't think that that solves the

11   problem, your Honor, because it is a conclusory allegation that

12   I had an unwritten complaint.  The statute plainly says:  It

13   has to be someone -- I am quoting now -- someone who provides

14   services pursuant to a contract in the workplace.  She has not

15   made that allegation and I don't believe she can make that

16   allegation.  She was always an unpaid contributor, an unpaid

17   guest.

18             THE COURT:  What about the allegation that she makes,

19   although I believe it was just in her opposition, about the

20   plugs for her website and podcast?  To the extent that I'm to

21   accept as true that that resulted in a monetary benefit to her,

22   do you think that is sufficient, and if so, why not?

23             MS. McKENNA:  I don't, your Honor.  First of all she

24   has repeated -- the reason she makes this argument, as your

25   Honor is aware, is because she needs to show that she has some

L7K5areA

1    form of remuneration in order to be an employee.  She admits,

2    in her complaint in paragraph 181, that she never received

3    compensation.  In her opposition she attempts to claim that she

4    was entitled to benefits which she says are sufficient so she

5    talks about plugs for her magazine.  I think that issue, your

6    Honor, is controlled by Court's decision in the *Hughes* case who

7    indicated that those kinds of ancillary benefits, including

8    claims that this would give me influence or publicity, fall far

9    short of the kind of remuneration required to make one an

10   employee.  I don't think that that saves her.  Nor does her

11   allegation that she got paid speaking opportunities.  If other

12   people offered her those opportunities that's not remuneration

13   from Fox News.

14           She also claims that she had an arrangement for hair

15   and makeup services for Fox on-air personalities.  Even if that

16   is so, it is not remuneration for her appearances as a guest.

17   She was an unpaid guest, she was never an employee, whether

18   under federal law, under state law, or under the newly enacted

19   state and city laws that talk about non-employees.

20           With respect to the New York City -- your Honor asked

21   about New York State.  With respect to New York City, it only

22   applies, as your Honor is aware, to those actions that occurred

23   after January of 2020.  Ms. Areu does not contest that many of

24   her claims, the ones that are prior to January 2020, would not

25   be covered.  And with respect to those that occurred after

L7K5areA

2020, she still does not qualify because she was not an intern,
a freelancer, or an independent contractor.  And she puts
nothing before the Court to suggest that being an unpaid guest
would somehow make her either an employee or a non-employee for
purposes of the statute.

So, she fails as a matter of law to be a person who is
entitled to the protection of either Title VII, the New York
State Human Rights Law or the New York City Human Rights Law.
Even if that were the case, none of the allegations that she
makes are allegations of conduct that is sufficient to be
actionable under state, or federal, or city law.

I would note at the outset, your Honor, that the
plaintiff, in her opposition, doesn't even engage in her
opposition motion to the analysis or the case law that we have
put forward.  She does not even mention the fact that Title VII
and the New York State Human Rights Law requires severe or
pervasive conduct.  She doesn't even mention the fact that is
insufficient, even under New York City law, where she needs to
show that she was treated less well on account of
discriminatory intent.  In fact, when we look at the
allegations and since your Honor has invited me to talk about
the motion to dismiss, we can come back to this in a separate
context under the sanctions motion but the conduct is legally
insufficient, as alleged.

With respect to Mr. Carlson, she says she began by

L7K5areA

saying, at least in her complaint, that he said he would be
alone in New York City one night and would be staying home
alone in his hotel room.  In the amended complaint, after
iterations, what she says is that implicitly suggested to her a
sexual encounter.  Even assuming that that is a plausible
inference under *Twombly* and *Iqbal*, the plain fact of the matter
is those comments are far less severe than cases that dismiss
such claims both under Title VII and New York State Human
Rights Law.  Your Honor will note that we identified in our
briefing cases that dismiss claims where there were explicit
date requests and literal sex propositions were insufficient.
Even more egregious conduct was found not actionable under New
York City Human Rights Law including actual romantic conduct
including allegations of alleged placement of genitals.  So,
the plain fact of the matter is it is legally insufficient.

          The same is true with respect to the allegations as to
Mr. Hannity.  She alleges, at most, that Mr. Hannity allegedly
insisted that a friend, who she brought to the set, take her
out for drinks.  Even if all of that is true -- and as you know
from the sanctions motion, your Honor, we think it is not true
and could have been found not to be true -- in any event, as a
matter of law, this is nothing more than the kind of statements
that the Courts have found to constitute petty slights and
trivial inconveniences and insufficient as a matter of law.

          Even worse are the allegations that Ms. Areu tries to

L7K5areA

1    put forward with respect to Mr. Kurtz.  She tries to suggest

2    that it was he who was soliciting interest from her and, in

3    fact, the allegations in the complaint as well as the actual

4    underlying e-mails show that in fact it was Ms. Areu who was

5    soliciting attention from Mr. Kurtz.  But, even on the face of

6    the complaint, she essentially says Mr. Kurtz did not respond

7    to her.  These comments are clearly insufficient as a matter of

8    law to state sexual harassment.

9            THE COURT:  From your perspective, can I consider the

10   back and forth of the texts between them to have been

11   incorporated into the complaint?  From your perspective, on a

12   motion to dismiss, can I look at the entirety of the back and

13   forth?  I think it is clear I can't look at the declarations

14   that were submitted in connection with the sanctions motion,

15   but in connection with the sanctions motions, the back and

16   forth between Mr. Kurtz and Ms. Areu was part of that same

17   discussion, can I consider all of this?

18           MS. McKENNA:  Yes, your Honor, I think you can,

19   because the reference in the complaint is to this exchange

20   before then so I think it is incorporated, by reference, in the

21   four corners of the complaint.  Even if you were just to look

22   at the allegations in the complaint itself, it is very clear,

23   if you look at paragraph 118, she says Mr. Kurtz didn't respond

24   to her sexual initiative.  And then says to her, in sum and

25   substance, I am making a note of your not responding to me.

L7K5areA

1    Those comments are not sexually explicit, they are not even

2    implicit, and in any event, they are too trivial and incidental

3    to give rise to liability.

4            With respect to poor Gianno Caldwell, the complaint

5    does not name him as a defendant.  Not surprisingly it doesn't

6    even mention he is a Fox News employee.  What she complains of

7    is that he allegedly told her to take him to lunch when she

8    wanted to go to lunch for him to facilitate a lunch with

9    Ms. Coulter.  That allegation, "take me to lunch," she distorts

10   into an attempt to coerce her into dating him.  The allegations

11   do not, your Honor, identify any conduct that was all based on

12   her gender or discriminatory motive and, at the very least --

13   and this is grudging, your Honor -- at the very least it was an

14   insensitive remark and doesn't rise to the level of creating a

15   hostile work environment.

16           That leaves us, of course, with her allegations as

17   they relate to Ed Henry.  I would note at the outset that

18   Ms. Areu does allege that any of the text conversations that

19   she had with Mr. Henry occurred in the workplace but

20   irrespective of that, Fox News can't be liable because it did

21   not know and did not have any reason to know of the alleged

22   conduct.

23           As your Honor knows, the standard for imputation of

24   liability to an employer is high under Title VII and New York

25   State Human Rights Law.  But, even if we just look at the

L7K5areA

1    standard for imputation under the New York City law, there only

2    can be imputation where the individual is alleged to have

3    managerial or supervisory responsibility, or where the employer

4    knew or should have known of the conduct.  She doesn't claim

5    that Mr. Henry exercised any managerial or supervisory

6    responsibility, in fact she doesn't even allege,

7    unsurprisingly, that she even worked Mr. Henry.  What she said

8    is she spoke to him once after a show.  She does not allege

9    that Fox News knew of Mr. Henry's statements or failed to take

10   corrective action.  In fact, she doesn't allege any facts to

11   show that Fox News should have known about Mr. Henry's

12   harassment and unreasonably failed to take steps to prevent it.

13           THE COURT:  I will tell you, I am inclined to agree

14   with you.  I will, of course, hear plaintiffs out with respect

15   to whether Ms. Areu was a Fox News employee.  So, I think what

16   would be more productive is for you to focus on those

17   allegations in the context of the retaliation claims.

18           MS. McKENNA:  Yes, your Honor.  I would be happy to do

19   so.

20           So, with respect to the retaliation claim, her

21   retaliation claim fails as a matter of law whether we look at

22   the pre-litigation conduct that she focuses on or the

23   post-litigation conduct.  So, with respect to pre-litigation

24   conduct, she can't make out a retaliation claim because she

25   never engaged in protected activity because an essential

L7K5areA

1    prerequisite to retaliation is that there is protected

2    activity.

3           THE COURT:  Is your view that rejecting a sexual

4    advance of a supervisor is never protected activity or just

5    wasn't in this case?

6           MS. McKENNA:  So, I, for what it is worth as an

7    employment litigator, disagree with the cases that say it can

8    ever be protected activity but I am mindful there are some

9    cases, your Honor, that suggest that rejection could be

10   protected activity, but those cases all arise in a context

11   where the plaintiff or the putative plaintiff had no other

12   place to go in order to make a complaint.  So, to your Honor's

13   question, they don't apply here because there were other

14   avenues where she could have made an objection.  The other

15   thing I would say, your Honor, is if we look at her

16   allegations, I don't even think she establishes that she

17   refused advances.  As to Mr. Carlson, she says she refused to

18   play along and change the sub, whatever that means.  She says

19   he says he was in his hotel room alone and she didn't engage.

20   That's not a rejection or refusal of an advance.  Not certainly

21   one that the person who extended the advance would know.

22           As to Mr. Hannity --

23           THE COURT:  Let's stop on Carlson for a second.

24           Taking plaintiff's allegations to be true and

25   inferences in her favor, what she is alleging is that she was

L7K5areA

1   asked to stay late after her appearance, that he was changing

2   his clothes -- again, I recognize that he has contested the

3   veracity of these statements -- and that he made a statement to

4   her about staying alone in a hotel room that night, and that

5   after she didn't respond in the way that she thought he wanted

6   to, that she was asked to be a guest on his show less often

7   going forward.

8        MS. McKENNA:  But, as your Honor knows, those

9   allegations of appearing less frequently are untrue and she has

10  been unable to deny the fact that she appeared, in fact in all

11  of these matters with respect to all three men, as much or more

12  than she had before.

13       THE COURT:  Do I have to accept the allegations in the

14  complaint as true?

15       MS. McKENNA:  You have to accept them except if they

16  are conclusory, your Honor, and these are conclusory, and as we

17  point out on the sanctions notion, capable and known to be

18  untrue.  If we could find them or your Instagram account, your

19  Honor, presumably she knew that they were there because she

20  placed them there.

21       I would also point out with respect to Mr. Kurtz, she

22  only says she politely declined his offer to meet her.  I am

23  raising this point, your Honor, not for the point about the

24  claims of how many times she was invited back, I have already

25  addressed that, in going to whether this is rejection --

L7K5areA

1          THE COURT:  Sorry, just to stop you on that, I don't

2     mean to interrupt but in paragraph 139 she says that in 2017

3     and 2018 Ms. Areu appeared on a very frequent basis on "Tucker

4     Carlson Tonight," and then she says, in parentheses, 22 times

5     at least in 2018 alone.  And then, later, she alleges that

6     after the time of this incident she was only on his show I

7     believe it was four times.  Paragraph 159 she alleges that

8     shortly after that incident Ms. Areu went from being a regular

9     on "Tucker Carlson Tonight" to being only on a handful of times

10    more.  In fact, Ms. Areu appeared only four times after the

11    incident, one of which was with a guest of, despite appearing

12    more than 20 times prior to 2018 alone.

13         So, what are you specifically alleging is false about

14    that?

15         MS. McKENNA:  Your Honor, the allegations -- and I can

16    talk about them more in the sanctions motion -- show that the

17    number of times that she appeared after she allegedly rejected

18    were no less than before but the point I was making earlier,

19    your Honor, is do we in fact have refusal behavior from which

20    one could conclude retaliatory conduct happened.  And on the

21    face of the complaint I think we do not have an allegation that

22    she complained or reported or objected in any way.  What we

23    have is her saying I was silent, I didn't respond.  I think

24    that does not place it within the rejection cases even if one

25    were to find that rejection was enough -- or I think the courts

L7K5areA

1    don't other than the couple of cases that we referred to

2    earlier, your Honor.

3         The other point I think I would make, your Honor, is

4    if there was an act of retaliation here, why would she have

5    been invited to appear at all?  In other words, in *Iqbal* and

6    *Twombly* you are to make reasonable inferences and what she says

7    is after I refused to play along -- and play along to her,

8    apparently, is silence on the basis of her allegations --

9    without even getting into the dispute is six too much, is three

10   too many, the question is why would she have been invited at

11   all if it was going to be retaliatory so it is not a reasonable

12   inference.

13        THE COURT:  To make it less obvious.  I mean, that's

14   an argument I would think plaintiff would make but I understand

15   your point.

16        MS. McKENNA:  And then, your Honor, I turn, if your

17   Honor likes, to the allegations that Fox News retaliated

18   against her after she filed suit.

19        THE COURT:  Let's actually just stick for a minute

20   with the allegations against the other individuals in the

21   context of retaliation.  So, I already asked you about

22   Mr. Kurtz and I have seen in the context of the sanctions

23   motion the back and forth, but just looking at the complaint --

24        MS. McKENNA:  Would you like me to go through

25   Mr. Hannity, Mr. Caldwell?

L7K5areA

1          THE COURT:  I am going in the order of the complaint

2     so Mr. Kurtz I believe was second, but she alleges in paragraph

3     120 that he said, after the back and forth about getting

4     together or not getting together in the hotel, he said I have

5     to remember you are the only woman here who tells me she's at a

6     hotel to simply tell me she's there.  You don't invite me over

7     or come to my hotel room.  I have made a mental note.  Why is

8     that not sufficient for a retaliation claim in the context of

9     her other allegations against him?

10          MS. McKENNA:  Well, first of all, I think on the face

11     of it it is ambiguous but more important to the point you made

12     before, your Honor, when you look at the totality of the

13     exchange what happens is he arranges, offers to meet her in the

14     hotel lobby after she is unable to meet him earlier, waits for

15     her, she does not come.  He says I'm here for a while.  She

16     doesn't respond.  He says I'm going to bed.  And she says wait,

17     wait, wait, wait.  Don't go to bed.  What's your cell phone

18     number?  What room are you in?  I'll come to you.  This

19     allegation that this was retaliatory, it is she who is pursuing

20     him, including minutes after that.

21          THE COURT:  See, that requires that I can in fact look

22     at that exchange that you presented in connection with the

23     sanctions motion.  Do you have any case law to support the

24     notion that I can do that, that I can look at a back and forth

25     text exchange of this sort as incorporated in the complaint?

L7K5areA

1          MS. McKENNA:  So, your Honor, I don't think we cited

2     it in the reply brief because I don't think the argument had

3     been made but I am aware of cases that make it clear that the

4     court can consider documents that are referred to in the

5     complaint and within the four corners of the complaint.

6          THE COURT:  And do you think this is one document, the

7     back and forth?  Are you analogizing the back and forth of this

8     text as one document in its entirety?

9          MS. McKENNA:  Whether it is one or many, your Honor,

10    it is clearly a communication.  She referenced a conversation

11    and exchange between the parties.  This is clearly part of that

12    exchange that is referenced there.

13          So, if your Honor believes that the allegations of the

14    complaint raise a question about whether or not she in fact

15    refused advances, I think on the face of the complaint it is

16    pretty clear she didn't refuse an advance but the context of

17    that e-mail exchange I think makes clear that there was not a

18    refusal of an advance here.

19          THE COURT:  I just want to turn back again to this

20    line in paragraph 120.  "You don't invite me over or come to my

21    hotel room.  I've made a mental note."  I mean here the

22    reference is not to the hotel lobby but to the hotel room

23    specifically.  Do you want to --

24          MS. McKENNA:  Well, I think all I would say, your

25    Honor, is it was she who invited herself to his hotel room, an

L7K5areA

1    invitation he did not accept.  She says I'll come over, tell me

2    what room you're in, give me your cell number.  He does not

3    respond to any of that.  It's absurd to think that she can

4    create a harassment complaint based upon her pursuit of him and

5    his silence in reply.

6         THE COURT:  Do you want to move on to the other

7    individual defendants?

8         MS. McKENNA:  Yes, your Honor.

9         With respect to Mr. Caldwell, what she says is that he

10   said take me to lunch.  She does not allege that she even

11   responded so there is no refusal there.  With respect to

12   Mr. Hannity, the most she says is that she felt mortified

13   uncomfortable, not that she did anything to refuse his

14   advances.  As to Mr. Henry, she alleges that she did her best

15   to change the subject and refused to play along.  Overall, all

16   of this does not allege a complaint, a rejection, or report any

17   showing of an objection that would make it -- remember, we are

18   raising this, your Honor, for purposes of has she engaged in

19   protected activity sufficient to make a claim of retaliatory

20   behavior.  I think she has failed factually even to do that.

21   She doesn't -- additionally, she doesn't show any causal

22   connection between her rejection and her failure to be hired

23   and there is no rejoinder in plaintiff's opposition to that

24   issue.

25        Shall I turn, your Honor, to whether or not there is a

L7K5areA

1    claim against individual defendants?  As your Honor is aware,

2    her claims of aiding abetting are under New York State and New

3    York City law because there is no individual liability under

4    Title VII.  Her aiding and abetting claims fail because they

5    are derivative of her claims against Fox, so if those claims

6    fail her claims also fail against the individuals.  And with

7    respect to New York State Human Rights Law, she can only assert

8    claims against the individuals if they were employers and there

9    is no allegation that the individual defendants here were

10   employers or that she even could be.  You have to have an

11   ownership interest, the power to hire and fire in order to be

12   an employer.  Under New York City law and New York State law

13   she also can't assert an aid and abet claim as I said if there

14   is no primary violation.  You don't get an aid and abet claim

15   under existing law.

16        And, lastly, there is no indication that any of the

17   individual defendants participated in conduct giving rise to

18   discrimination claims, none of them participated in

19   discriminatory behavior and, as a consequence, no claims can be

20   lodged against the individual defendants.

21        That's all we have, your Honor, on the motion to

22   dismiss, unless your Honor has other questions.

23        THE COURT:  No.  Thank you.

24        Ms. Foti, would you like to be heard on behalf of

25   Mr. Henry?

L7K5areA

1           MS. FOTI:  Yes, your Honor.

2           I know we have gone over a lot of ground for Mr. Henry

3   in terms of why the motion should be dismissed but let me start

4   by saying that Mr. Henry really came into the scenario of

5   Ms. Areu's complaint only in May of 2019 where there was a

6   quick meeting between Mr. Henry and Ms. Areu after a show, he

7   did not know her, he took a picture, and then nothing happened

8   for almost a year.  And then the two began engaging in what we

9   would call meme wars.  And it is interesting and I appreciate

10  the fact you have asked whether or not you can consider entire

11  texts, even if they're not cited in the complaint.  And just,

12  your Honor, what we are looking for but we don't have our

13  Eckhart materials here, but there are cases cited in those

14  briefs that specifically support that you can consider the

15  entirety of the text, it is one document.  And in terms of

16  completeness, for evidentiary purposes, it should be considered

17  for fairness.

18          THE COURT:  We will be back here tomorrow.

19          MS. FOTI:  Yes.

20          THE COURT:  We can discuss it further then.

21          MS. FOTI:  We will have the case then for you that we

22  can cite for you.

23          But, significantly, when we are talking about the meme

24  wars, it is Ms. Areu who says you are like the nicest person on

25  the planet -- speaking to Mr. Henry -- you're awesome and you

L7K5areA

let me win at gif meme wars.  That is what was happening
between them.  They were engaged in a personal conversation, a
personal meme war conversation.  There is nothing in the
complaint to suggest that there was anything more than that.
Now, admittedly, we might not like the nature of the exchange,
we may think this is two consenting adults, it is a little odd
that they're exchanging these types of memes, but they are
consenting adults and it does not have to do with the
workplace.  And, indeed, what is significant is that it is not
a civility code.  That is a well known quote about the Human
Rights Laws.  These are not civility codes.  We are not here to
gauge whether or not we like or dislike how people communicate
with each other.  What is significant about the Human Rights
Laws is whether or not an employer is conducting his workplace
in an appropriate way whether or not things should be
prohibited in the workplace and that is with respect to
employees.  Here I think you have already indicated, your
Honor, that I don't believe that the plaintiffs have alleged
that Ms. Areu was an employee of Fox.  If she's not an employee
of Fox then Human Rights Laws should not apply and they should
be able -- Mr. Henry and Ms. Areu -- should be able to engage
in this type of back and forth conversation freely as
consenting adults.

          THE COURT:  The context of the back and forth, I am
just trying to find where it was in the complaint but there was

L7K5areA

1    one allegation, essentially, to the effect that he berated her.

2    Give me one second.

3         MS. FOTI:  You may be looking at paragraph 174, your

4    Honor, about the "boring"?

5         THE COURT:  May be.  Hold on.  Thanks.  It is actually

6    175 where it says in the second half of the paragraph,

7    Mr. Henry making it clear he was unhappy that Ms. Areu had

8    decided not to sleep with him in exchange for his assistance

9    with her career wrote:  Now you decided to be a jerk which made

10   me sad.

11        MS. FOTI:  Your Honor, I think you cannot read that

12   alone.  If you look at paragraph 174 about the text message and

13   what the complaint specifically talks about is that the two

14   were speaking over the phone on May 21st.  According to the

15   complaint, Ms. Areu was direct with Mr. Henry and asked whether

16   he thought that Fox News might be hiring.  Mr. Henry made it

17   clear what he expected from Ms. Areu.  There is no quotes

18   around that.  If she wanted his assistance.  Specifically he

19   started berating her for being boring and not who he thought

20   she was.  Cathy Areu does not assuage Mr. Henry's concerns by

21   indicating she was not boring, i.e., also not in quotes, that

22   she would be willing to engage in sexual acts with him,

23   Mr. Henry ended the call.  Then they don't communicate for a

24   couple of weeks and she calls him back.  *Wait, you haven't*

25   *written me since we spoke.  I suck that bad.*  I think that is

L7K5areA

very significant.  There is nothing in quotes about him asking
her to sleep with him.  What she says is basically he indicated
she was boring.  Well, if in fact she thought what he was
saying is you have to sleep with me in order for me to help you
get a job, then two weeks later she writes back and she says
you haven't spoken to me since.  I suck that bad.  That is not
an indication that she thought that he wanted her to sleep with
him because she has already said no, supposedly, to that.  She
has already said no to the fact she doesn't want to sleep with
him and she is now reaching out to him again asking him to
basically explain to her what was wrong in terms of why she was
boring.  I don't think there is any plausible explanation in
terms of those two texts to suggest that when she reaches out
to him that she is talking about anything other than the fact
that she apparently was boring and that he was engaged in some
conversation with her to try to understand maybe her
background, what she was all about, and she then says I suck
that bad.  She doesn't say in the perfect situation where she
could say, *I'm not going to do what you want me to, could you
still help me?*  I think you cannot read this to plausibly be a
request that he sleep with her.  That said, whether or not that
is something he wanted to suggest it really doesn't matter
here.  He is not her employer, he is simply a co-employee of --
he is an employee of Fox.  She is someone who is a contributor
and she has said all she actually has ever asked him to do is

L7K5areA

1    talk to someone else at Fox on her behalf.  Now, if you look at

2    the complaint, that's one thing that she is actually arguing in

3    her motion but the complaint itself doesn't actually read that

4    way.  The complaint says on paragraph 80 that she texts

5    Mr. Henry and asks whether he would recommend she speak to Fox

6    News, Laurie Peterson, about a paid position.  The complaint

7    doesn't even say, *I want you, Mr. Henry, to speak to Fox News*

8    *on my behalf but should I speak to this person.*  And the reason

9    for that is she knows that Mr. Henry has no authority to hire

10   or fire anyone.  Mr. Henry has never, according to the

11   complaint, had her even on his show.  She is not, apparently,

12   asked to be on Mr. Henry's show.  That's not in the complaint

13   either.  There is no allegation about anything having to do

14   with him being any type of supervisor, he has no ownership in

15   Fox, any of the characteristics that are necessary for him to

16   be --

17        THE COURT:  He would be liable for retaliation even if

18   he wasn't an employ or supervisor, right?

19        MS. FOTI:  He could be, your Honor, if he was not --

20   if, in fact, he participated in any sort of retaliatory conduct

21   but I don't see anywhere in the complaint where there is an

22   allegation that he has participated in any retaliatory conduct.

23   All they say is that he is silent.  They don't say that he

24   reached out to someone that said do not hire her.  He doesn't

25   do anything.  If you read their motion, their opposition which

L7K5areA

1    suggests that there was some sort of retaliation because he

2    somehow didn't talk to her any longer after she supposedly

3    refused to sleep with him, he doesn't do anything.  He doesn't

4    talk to her.  How is that retaliatory conduct?  He doesn't

5    reach out to an employer, he doesn't spread word on the

6    Internet that there is something wrong with her.  He does

7    nothing.  There is no allegation here that could support a

8    claim for retaliation.

9         I think on the other issues, your Honor, I think

10   Ms. McKenna has very correctly addressed many of those issues

11   in terms of whether or not there is any other allegations here

12   that would support a claim for being an employer, there is no

13   allegations as to aiding and abetting because there is actually

14   no underlying violation and, specifically, the only claim they

15   make would be claims that Mr. Henry himself engaged in some

16   harassing conduct which if you accept that he was some sort of

17   employer, could accept that that harassment was actionable, he

18   cannot aid and abet his own conduct in harassing Ms. Areu.  So,

19   there would be no aiding and abetting either.

20        THE COURT:  Thank you.

21        Ms. McKenna, I have one more question for you before I

22   turn to plaintiff's counsel and that is if I were to find that

23   Ms. Areu has alleged that one of the individual defendants

24   retaliated against her, one or more, whether Fox News can be

25   held liable for that and for that to happen the individual who

L7K5areA

1    engaged in the conduct would have to be the supervisor of the

2    plaintiff, correct?

3            MS. McKENNA:  Correct, your Honor.

4            THE COURT:  And, at least in the *Hughes* case, Judge

5    Pauley held that a Fox News presenter Charles Payne, was

6    plaintiff's supervisor because he exercised his influence to

7    give her regular appearances on the show even though she wasn't

8    an employee.  I am wondering if you can respond to that.  Do

9    you disagree with *Hughes*?  Is it distinguishable in your view?

10           MS. McKENNA:  I do disagree, your Honor, with *Hughes*

11   to the extent that there is an allegation in *Hughes* that merely

12   inviting her on the show would be sufficient to charge the

13   employer with responsibility for whether she is hired or not.

14   I also think here the facts are distinguishable because, unlike

15   in *Hughes*, the plaintiff here was in fact hired back multiple

16   times after the alleged oppositional behavior.  So, I think

17   factually it doesn't square with the allegations in *Hughes*.

18           THE COURT:  Thank you.

19           And who would like to be heard now on behalf of

20   Ms. Areu; Mr. Valli?  Ms. Hincken?

21           MR. VALLI:  That would be me, your Honor, and I

22   apologize if I don't focus right on your face because of my

23   glasses.

24           First and foremost, your Honor, everyone in this room

25   needs to be reminded of Rule 8 and notice pleading.  The

L7K5areA

1    defendants have a --

2                THE COURT:  If you can say that again?  I think some

3    folks had trouble hearing you.

4                MR. VALLI:  Sure.

5                We are working under Rule 8 with notice pleading.  The

6    defendants have a wealth of information that my client, who is

7    an unpaid contributor, was working through an agent with Fox

8    executives to become a paid contributor.  She was there and was

9    on numerous shows over a number of years.  She had a tag line,

10   "The Liberal Sherpa."  She was told this is huge, this is big,

11   you're on your way.

12               THE COURT:  She didn't have a contract.

13               MR. VALLI:  No.

14               THE COURT:  She wasn't paid.

15               MR. VALLI:  Unpaid.  Right?  But that's what everyone

16   is working towards.  Right?  They're all unpaid guests.  And in

17   terms of this other concept of employer versus not employer,

18   all of these individuals either book for themselves or have

19   bookers over which they have control.  That's the issue.  Once

20   she rejects these advances -- and we will get to that in a

21   second -- she is not hired anymore.  Does she get an appearance

22   here or there?  Sure.  But where is she now?  She hasn't

23   appeared on Fox ever again.

24               THE COURT:  First of all, we have to distinguish,

25   don't we, between the individual defendants who had their own

L7K5areA

1    shows and had the ability to have her back or not have her

2    back; and separately, the individuals at Fox who made the

3    decision not to offer her or not to have yet offered her a paid

4    position.  And I don't think the allegations are clear as to

5    who made the decision whether or not to make her a paid

6    employee.

7              MR. VALLI:  I don't disagree, your Honor.  That's why

8    we are at the motion to dismiss stage, we have no discovery.

9    We have asked for discovery, it has been denied.  So, we can't

10   pull back the curtain, we can't see what is going on, but I

11   certainly think we can allege there is a symbiotic relationship

12   between the people who appear on TV and the people at Fox

13   because if you don't get the ratings, you don't get the job.

14   If Hannity and the other people don't want her on their show

15   they're going to say we don't want her on our show.

16             THE COURT:  She was on each of the individuals' shows

17   after the incidents in question.

18             MR. VALLI:  For a minimal amount, Judge.  And this is

19   where I have a significant problem with the defendants' papers

20   because every fact enures in my client's favor.  Every

21   questionable occurrence must be viewed favorable to my client.

22   They present facts in a Rule 11 and then seek to boot strap

23   those facts into a motion to dismiss.  This is totally

24   improper.

25             THE COURT:  We are not going do that.  I mean, the

L7K5areA

1    one --

2          MR. VALLI:  OK.

3          THE COURT:  The one piece of evidence, I will call it

4    that, that that was presented in connection with the sanctions

5    motion that I asked about today and asked about whether I can

6    consider and I would like, to the extent either side has cases

7    on this and Ms. Foti said that she may and will raise them

8    tomorrow, is whether, if the complaint references particular

9    text messages, and those text messages were part of an exchange

10   back and forth in an ongoing text message exchange, whether I

11   can consider the entirety or at least more of the text message

12   exchange than is included in the complaint.  That was really

13   the only allegation or fact that I was inclined to consider if

14   I am permitted to do so under the law.  As I said earlier, I am

15   not going to consider any of the declarations as I think it

16   would be inappropriate to do so on a motion to dismiss.

17         MR. VALLI:  I apologize, your Honor.  I did not hear

18   that and I agree with you, I think it would be inappropriate to

19   use the outside evidence.

20         In terms of the texts, I kind of view it like a

21   contract that is referenced within a complaint and you are then

22   allowed to look at the entire contract.

23         THE COURT:  Right.

24         MR. VALLI:  So, I think you would be able to look at

25   the texts, I think it would be irresponsible for me to say

L7K5areA

1    something other than that and I think that's where I am.

2                    THE COURT:  OK.

3                    MR. VALLI:  In terms of the plausibility argument and

4    the defendant's position, *Anderson News* from the Second Circuit

5    is very helpful because it talks about the Court or the

6    defendants coming up with a more plausible explanation for the

7    events alleged in the complaint and it is improper for both the

8    defendants and the Court to say, you know what?  This is more

9    plausible, I'm going to disagree with the plaintiff.

10                   THE COURT:  I agree with you.

11                   MR. VALLI:  OK.

12                   THE COURT:  I agree with you.  My job is to look at

13   whether the allegations are in fact plausible.  But why don't

14   we start with the employment issue.  Right?  So, in *Hughes* the

15   Court concluded that the plaintiff, an unpaid contributor akin

16   to Ms. Areu, did not qualify as an employee under Title VII.

17   Why is *Hughes* either wrong or distinguishable, in your view?

18                   MR. VALLI:  I think the holding in *Hughes* provides an

19   avenue for individuals like Ms. Areu to claim employment when

20   they're unpaid because they're in this position that is not the

21   traditional employment position.  Right?  There is no exact

22   path to promotion or path to hiring.  So, there is other

23   avenues within which you can seek compensation as an employee.

24   In Ms. Areu's case she is differentiated because she has a

25   company that gets paid for hair and makeup.  That puts her in a

L7K5areA

1  completely different light than other plaintiffs such --

2          THE COURT:  They're doing her hair and make up

3  exclusively for her on the shows.

4          MR. VALLI:  No, Judge, they do hair and make up for

5  other people at Fox, not just my client.  I don't know if that

6  allegation is clear.

7          THE COURT:  Turn me to that allegation in the

8  complaint.  What paragraph is that?

9          MR. VALLI:  I don't have it at my fingertips, your

10  Honor.  I apologize.

11          THE COURT:  I can look for it later as well.  The

12  plugs for her website were not mentioned, and the podcasts were

13  not mentioned, in the amended complaint; correct?

14          MR. VALLI:  Correct.

15          THE COURT:  And are you now asserting that there was

16  an implied contract?

17          MR. VALLI:  Yes.

18          THE COURT:  Where is that asserted in the amended

19  complaint?

20          MR. VALLI:  I don't believe we asserted them in the

21  amended complaint, your Honor.

22          THE COURT:  The New York City Human Rights Law permits

23  discrimination claims by interns, freelancers, and independent

24  contractors.  Do you view her as one of the three?  Do you view

25  her as freelancer or an independent contractor?

L7K5areA

1          MR. VALLI:  We certainly view her in that light.  And

2     I believe in the motion to dismiss we also talk about how the

3     Human Rights Law, New York City Human Rights Law has been

4     interpreted to be expansive, so we certainly would argue that

5     she is covered by the New York City Human Rights Law.

6          THE COURT:  Are there other arguments you would like

7     to make with respect to her employment and why I should view

8     her either as an employee or as a covered non-employee.

9          MR. VALLI:  Give me a second and I will jump to that

10    section, your Honor.

11          In terms of how Fox treated my client, she was told

12    when to appear, where to appear, why to appear, who to appear

13    with, on what topic she would opine, what she should look like,

14    and what she should say on those topics.  These are the very

15    factors that that the Court looks at in determining whether or

16    not someone is an employee.

17          THE COURT:  That's true for any guest on a television

18    show, correct, of this sort that they have to know when to

19    appear, where to appear, and what is appropriate.

20          MR. VALLI:  Sure.

21          THE COURT:  What to wear?

22          MR. VALLI:  I would agree.  So, those factors all --

23          THE COURT:  Do you think anyone is an employee who

24    goes, is a guest on a show of this sort, be it Fox or MSNBC,

25    anyone who appears on one of those shows is necessarily an

L7K5areA

1    employee of the company?

2              MR. VALLI:  No.  Not at all, your Honor.  There are 12

3    other factors such as the location, the skill required,

4    additional projects, the discretion over how long, the length

5    of the relationship.  So, I think when you look at it in terms

6    of a motion to dismiss, all of these factors side with my

7    client.  If we are having this conversation on a motion for

8    summary judgment maybe I don't feel so confident.

9              THE COURT:  She has the information, she could allege

10   more about her status as an employee.  She may not have a lot

11   of information about decisions made at Fox but she can allege

12   whatever she knows about her relationship and any statements

13   made that may suggest there was an implied contract or anything

14   else.

15             MR. VALLI:  I agree with you and that's why, at a

16   motion to dismiss stage, plaintiffs will generally ask for

17   leave to replead because now we have the benefit of knowing

18   what the concerns are.  We have the benefit of knowing, oh, you

19   have an issue with this.  Can we correct this?  Notwithstanding

20   counsel's argument that I am somehow going to make up the

21   facts.  Right?  I'm going to talk to the client, I'm going to

22   figure out do we have facts to address this concern?  And we do

23   that all the time.

24             THE COURT:  OK.

25             MR. VALLI:  In terms of the comments, Judge, these are

L7K5areA

1    sophisticated defendants.  I know recently you dealt with an

2    unsophisticated defendant who was a real pig.  I don't know if

3    these gentlemen are pigs or not here but they're really slick.

4    I'll bring the wine, you perform the tasks.  *You're the kind of*

5    *girl who tells me she's at a hotel room just to let me know*

6    *she's in the hotel room.*  I mean, you cannot view that any

7    other way other than a sexual innuendo or offer at this stage

8    of the proceeding.

9              THE COURT:  Are you talking about Carlson or are you

10   talking about Kurtz?

11             MR. VALLI:  I'm talking about all of them, Judge.

12   Right?

13             THE COURT:  Any reference, even a reference to meeting

14   in a motel lobby is necessarily a proposition?

15             MR. VALLI:  No.  I'm not going to compartmentalize it

16   like that, right, because to hold the Fox defendant liable it

17   is all the acts of the other individual defendants and, when

18   taken as a whole, when looking at this defendant and looking at

19   what another defendant has said about them --

20             THE COURT:  So just make clear to me, are you alleging

21   hostile work environment?  Is that what you are saying?  Are

22   you saying with respect to retaliation or with respect to

23   hostile work environment?

24             MR. VALLI:  I'm saying that Ms. Areu was denied a

25   position due to gender discrimination.  I am saying that she

L7K5areA

1    was subjected to a hostile work environment with respect to

2    some of these comments and that there was a *quid pro quo*

3    offered for sex which she rejected and then she suffered the

4    retaliation because she did so.

5         THE COURT:  So on the denial of the promotion --

6         MR. VALLI:  For the position.  I apologize if I said

7    promotion.

8         THE COURT:  The position; when you say the position

9    you mean being paid?

10         MR. VALLI:  Yes.

11         THE COURT:  Where have you alleged who it is that was

12    making those decisions and what the connection is between the

13    allegations with respect to failure to hire and who made those

14    decisions?

15         MR. VALLI:  So, in paragraph 56, your Honor, there is

16    a discussion about a conversation that Ms. Areu had with Ron

17    Mitchell who is the vice president of prime time programming at

18    Fox News.  In paragraph 58 she begins working with an agent at

19    William Mars about a contract with Fox.  So, we only have one

20    side of the transaction.  We don't know who was on the Fox

21    side.  I hope to get that through discovery.

22         Returning to the plausibility argument, I am sure you

23    are aware that Mr. Henry has filed his own complaint against

24    Fox News in New Jersey and some of the allegations there, I

25    would argue, should be deemed not admissible for purposes of

L7K5areA

1    summary judgment or trial but certainly admissible to assist

2    the Court with determining the plausibility of Ms. Areu's

3    claims.

4            So, there is an allegation that the CEO -- this is by

5    Mr. Henry, an allegation that the CEO of Fox repeatedly --

6    repeatedly -- covered up sexual misconduct by senior Fox News

7    management, that she was not concerned about transparency to

8    the public and there were numerous other instances of sexual

9    misconduct.

10           THE COURT:  She -- I am looking at the transcript.

11   That she was not concerned about transparency?  Female A?

12           MR. VALLI:  No, the CEO, Ms. Scott, Suzanne Scott.  It

13   is Ed Henry v. Fox, it is in the District Court of New Jersey,

14   the CV is 21-13167, and I believe there are two other

15   complaints that I have not yet had a chance to review regarding

16   Mr. Henry suing people relating to his termination.

17           There is allegations that the CEO covered up sexual

18   abuses by employees, that there was a pattern of coverups.

19           THE COURT:  How is all of this related to the failure

20   to hire Ms. Areu as a paid employee?

21           MR. VALLI:  I was getting to that, Judge.  There is a

22   section of that complaint that talks about the fact that Fox

23   News has a blacklist that prevents hosts like Carlson and

24   Hannity who inviting guests who have criticized or otherwise

25   offended the Murdoch family or Fox News senior management.  So

L7K5areA

1    our allegation in terms of her hiring -- once the complaint is

2    filed, once she is known as a problem at Fox News, that's it,

3    she's out, she is retaliated against, she is never going to

4    work there.

5           Judge, just to address some of the other points?  The

6    EEOC, obviously we think *Hernandez* is correct, we think *Gibb* is

7    wrong.  There is an recent decision by an Eastern District

8    Judge that sides or leans toward *Gibb* but at the same time it

9    dismisses, without prejudice, to refile once the EEOC has

10   completed its investigation because, as your Honor noted, it is

11   effectively moot, they're going to say, oh, the 180 days has

12   passed, we are done.  I would also note that in that case there

13   is no prejudice to the plaintiff.  In this case a dismissal,

14   unless your Honor tolls the state and city claims, would result

15   in prejudice to Ms. Areu because those claims would be

16   time-barred.

17          THE COURT:  Is your failure to hire claim a

18   discrimination claim?  A retaliation claim?  Both?

19          MR. VALLI:  Both.  It is two separate claims, your

20   Honor.  It is when she rejects the advancements, when she

21   doesn't play ball, when she is not the party girl, she stops

22   getting work.

23          THE COURT:  What is the basis of your claim for

24   discriminatory failure to hire?  I think you have one paragraph

25   about certain men who were promoted faster than her but tell me

L7K5areA

1   why you have adequately alleged that they are similarly

2   situated.

3           MR. VALLI:  Fox will use unpaid guests, unpaid

4   contributors.  Ms. Areu, on numerous times, has tried to engage

5   in conversation about becoming a paid contributor and she has

6   witnessed men with whom she is appearing with being approached

7   about becoming paid contributors, about the cultivation of

8   their careers when she is not given that same opportunity.

9           THE COURT:  Let's look at the paragraph where you have

10   alleged that and tell me again why -- I mean, I see here that

11   you say in paragraph 81 the male applicants at Fox News did not

12   face these same hurdles but I'm looking to see where you have

13   alleged that they are similarly situated.

14           MR. VALLI:  I don't know if we made that allegation in

15   the complaint, your Honor.

16           THE COURT:  All right.  So, let's talk about

17   retaliation.  And what I would like to do is do essentially

18   what I did with Ms. McKenna and go through the allegations and

19   let's assume that I accept the general proposition that

20   rejecting a sexual advance of an employer is protected activity

21   so let's just assume that I do agree with that.  Let's start

22   with Mr. Hannity.  Where have you alleged that Ms. Areu engaged

23   in protected activity?  What is the protected activity?  He is

24   not alleged to have propositioned her in any way or that she

25   rejected him in any way so what is the protected activity with

L7K5areA

1    respect to Mr. Hannity for purposes of retaliation claim?

2              MR. VALLI:  Her not playing along when he is

3    attempting to offer money to men in the room to take her on a

4    date.

5              THE COURT:  How does she not play along?  You allege

6    in the complaint she wrote him an e-mail thanking him for the

7    money for dinner.

8              MR. VALLI:  She has to walk a very fine line.  Right?

9    And we have case law that we have cited to, if you outright

10   reject the offer, well then you have insulted the male and you

11   are going to suffer retaliation.  If you accept the offer,

12   well, now you have engaged -- you are in sexual harassment.

13   Right?  So, to me she is in an incredibly difficult situation

14   where she is trying to be involved without allowing herself to

15   be abused sexually or to have to be involved in a sexual

16   relationship.

17             THE COURT:  Where is that line for purposes of

18   alleging protected activity, as you must, for a retaliation

19   claim?  Let's say you were a woman working at a network and you

20   knew that to move up you had to engage in sexual activity with

21   someone, that was the understanding, but that you were never

22   propositioned.  Would there be any protected activity there?

23             MR. VALLI:  Sitting here right now, your Honor, I

24   don't know.

25             THE COURT:  OK.  So, where, with respect to the

L7K5areA

1    allegations regarding Mr. Hannity, what exactly was her

2    protected activity?  Again, I want you to really focus me on

3    what is the protected activity.  Again, assuming that I fully

4    agree with you that rejecting a sexual advance would be

5    protected activity.  OK?  So let's go from there and say with

6    respect to Mr. Hannity, what is the protected activity that she

7    engaged in?

8         MR. VALLI:  Not fully engaging in the banter regarding

9    someone being paid to take her out, your Honor.  That is the

10    allegation.

11         THE COURT:  Meaning what?  That she didn't say what

12    she should have said?  That she shouldn't have written him the

13    e-mail?  What does that mean?

14         MR. VALLI:  Again, it means that she is trying to

15    participate with the men but at the same time not succumb to

16    the advances in the workplace.

17         THE COURT:  Did he make an advance towards her.

18         MR. VALLI:  No, but he is encouraging men to take her

19    out and give them money.  I find that to be sexually

20    inappropriate.

21         THE COURT:  Well, put aside, take the allegations as

22    true -- he has denied them but taking the allegations as true

23    and taking the allegations to be misogynist or sexist but,

24    again, how is she opposing the conduct?  How did she oppose it,

25    how did she protest it which is the language in the case law.

L7K5areA

1    Again, what is her protected activity with respect to

2    Mr. Hannity?  (pause)

3          We can move on to the other individual defendants, if

4    you would like.

5          MR. VALLI:  I don't see anything in the complaint.

6          THE COURT:  OK.  All right.  You don't see anything in

7    the complaint.  OK, so let's turn now to Mr. Carlson.

8          Here you have allegations that I addressed earlier and

9    in the context of being asked to stay late he is alleged to

10   have made a comment about how he was staying alone in his hotel

11   room, that he would be alone in New York City that night and

12   that he would be staying alone in his hotel room.  That's

13   paragraph 150.  What is the protected activity she engaged in

14   here?  He didn't say what hotel room he was in, he didn't say

15   what hotel he was in.  And I fully recognize that a lot of

16   sexual advances are subtle, it is not -- and a lot is unsaid

17   and I understand that, but looking here he didn't ask her to

18   dinner, he didn't ask her to meet at a hotel, he just made that

19   comment.  So, in that context, what was her protected activity?

20         MR. VALLI:  Her protected activity is not engaging

21   further in conversation about him being alone in a hotel room

22   and the context is important.  She has never been asked to stay

23   late before.  Most of the staff is gone.

24         THE COURT:  But there is another man in the room.

25         MR. VALLI:  There is another man in the room who has

L7K5areA

1    to disconnect her from the audio and I guess the audio

2    equipment.  He is changing his clothes and he says to her I'll

3    be alone in a hotel room tonight.  I mean, at that point either

4    she is going to engage or she's not, and the fact that she

5    doesn't engage is her protected activity.

6              THE COURT:  All right.  And with Mr.  --

7              MR. VALLI:  And, your Honor, just one other thing?  I

8    apologize.

9              THE COURT:  Sure.

10             MR. VALLI:  When she asks why did you ask me to stay

11   late and he laughs at her and says, *Did you think I had a job*

12   *for you?*  It is obvious.  She's thinking I have to do this to

13   get myself advanced and to him it's a joke.  Her staying late

14   and not engaging is a joke.  Sorry.

15             THE COURT:  And then with respect to Mr. Kurtz, and so

16   assuming that I can consider the back and forth as you conceded

17   earlier, you have him saying she's asking him for advice so she

18   is reaching out to him and then he is saying, *I may have a*

19   *little time to chat in the hotel lobby, ping me and we will*

20   *figure it out.*  And then she says, *Want to do drinks later?*

21   She says, *Do you want to do drinks later?*  He says, *I may have*

22   *a little time to chat in the hotel lobby.*  There is a little

23   bit of back and forth.  And then he says, *Do you want to come*

24   *to the Muse lobby at 7:15?*  And she responds, *I'm going to meet*

25   *a friend for dinner, do you want to join?*  *He is a dude, are*

L7K5areA

1    *you OK with that?* He said, *I already ate and don't have time,*

2    *have fun.  Maybe I can briefly see you tomorrow or call.*  And

3    she responds, *Ugh.  I want to see you.  He is my hair and make*

4    *up artist and it is his birthday.  Will you will be around 9,*

5    *wait.  You don't have time?  Where you going?* And he said, *I*

6    *have work, believe it or not.*  She responds, *If you are bored,*

7    *my hair guy and I are at the bistro next to Mellow, wine,*

8    *olives, bread pigging out.*  And then ultimately he makes the

9    comment that I questioned defense counsel about earlier where

10   he says, *You know, I have to remember that you are the only*

11   *woman here who tells me she is at a hotel simply to tell me she*

12   *is there.  You don't invite me over, come to my hotel room.  I*

13   *have made a mental note.*

14          Why don't you address that.  So there, what was the

15   protected activity that she engaged in for purposes of

16   retaliation?

17          MR. VALLI:  Again, she is not willing to go to

18   someone's hotel room or invite him over to her hotel room.  He

19   knows what's going on, that's why he says that to her.  And

20   soon thereafter she appears three times and then never again on

21   his show.

22          Your Honor, the men -- they're probing.  Right?  How

23   far can I push the envelope?  Can I discuss sex with you?  Can

24   I send you sexual pictures?  Can I touch you on the shoulder?

25   Can I invite you to a hotel room?  How far can she be pushed.

L7K5areA

1   That's what's happening here, at least that's what I'm going to

2   allege -- and it's -- that's what's happening, they're probing.

3              THE COURT:  With respect to Mr. Caldwell, are you

4   engaging that Caldwell engaged in retaliation?  She suggested

5   lunch and he said you can take me to lunch.

6              MR. VALLI:  No, your Honor.  I don't think it is

7   retaliation.  I don't think he is a named defendant.  If he was

8   I thought we had taken him out.  That was an example of what

9   she is dealing with trying to get connections to Ann Coulter,

10  it is a career cultivating meeting and he is like no, take me

11  out to lunch.

12             Context is everything.

13             THE COURT:  And then, lastly, recognizing the back and

14  forth between Ms. Areu and Mr. Henry just focusing on

15  retaliation, how did he retaliate?  Just point me to the

16  paragraphs in the complaint that you are relying on.

17             MR. VALLI:  In that paragraph but I didn't read the

18  last line.  After all of that colloquy when she says, you know,

19  *Did I suck so bad?*  He is like, *no, you decided to be a jerk*

20  *which made me sad.*  She's a jerk, she's not a party girl.  I

21  can't push you any further, I can't have sex with you, so I'm

22  going to cut you off.  And he did.

23             THE COURT:  OK.  How did he cut her off?  What are the

24  allegations with respect to how he cut her off?  She was never

25  on his show to begin with, right?

L7K5areA

1          MR. VALLI:  She was on so many shows early on, your

2     Honor, I don't know if she was on a show with him where he may

3     have been a host but not his show in particular.  But, no, at

4     that point the communication stops, there is nothing further,

5     he is not assisting her with trying to get a paid position.

6          THE COURT:  Does he have an obligation to assist her?

7          MR. VALLI:  No.  But if he is going to change his

8     behavior based upon her rejecting his sexual advances I think

9     that is retaliation.  If you flip that he is expecting her to

10    have sex with him in exchange for his help regarding the paid

11    position.

12         THE COURT:  Was he assisting her before?  What

13    changed?  Again, I'm focused on retaliation so you need the

14    protected activity and then you need the retaliation.

15         MR. VALLI:  The retaliation is all of these men are

16    probing, they're seeing how far they can get.  She's using that

17    in an effort to ingratiate herself with them because someone

18    could put her on the show more often, someone could put a good

19    word in for her to be a paid contributor and once that

20    relationship does not go further she is no longer worth it.

21    Right?  The time and effort that they're using up to engage

22    socially with Ms. Areu, there is no benefit to them, there is

23    no -- they're not going to get sex out of it so why should do I

24    it any further.  And that's what happens.  There is no other

25    reason.

L7K5areA

1              THE COURT:  All right.  OK.  All right.

2              Any rebuttal on the motions to dismiss or should we

3    just turn briefly to sanctions?

4              MS. McKENNA:  I just have this observation with

5    respect to the attention your Honor has thankfully given the

6    retaliation claims and that is I think plaintiff's counsel

7    improperly conflates the protected activity, for purposes of

8    retaliation, with whether conduct is appropriate for purposes

9    of establishing a sexual harassment claim, whether or not it is

10   appropriate to establish a failure to hire claim, and I think

11   an examination, as your Honor just went through the paragraphs

12   of the complaint about whether or not Ms. Areu's behavior

13   constituted protected activity shows that the allegations on

14   the face of the complaint are deficient.

15             The second thing I would add is in response to your

16   Honor's earlier question about the *Hughes* case, going back to

17   look at Judge Pauley's decision -- God rest his soul -- Judge

18   Pauley noted that Mr. Payne, and I am quoting now at page 429:

19   Payne threatened to remove her from consideration for the

20   position she was applying for telling her to leave his office

21   if she thought "someone else can get you the contributorship."

22   And then a little later on Judge Pauley says, Here Payne's

23   overt threats to cut *Hughes* off from future appearances which

24   immediately followed *Hughes*' decision to end the affair

25   established the nexus between her protected activity and

L7K5areA

1    defendant's adverse employment action.  I think the nature and

2    extent of those allegations are quite different from what we

3    have here.

4            THE COURT:  Doesn't plaintiff's counsel make a fair

5    point that propositions are -- that sometimes comments are

6    subtle, intentionally so?  Right?  And so if sexual

7    propositions are made in a way that's more subtle, this is *I'm*

8    *in my hotel room, I'll be alone.*  And if a suggestion like that

9    is made and a woman doesn't follow through or respond in an

10   appropriate manner and then after that point in time is on

11   someone's show less often than they were before, why aren't

12   allegations of that sort enough to survive a motion to dismiss?

13           MS. McKENNA:  Because the question here, your Honor --

14   and I forget which case it may have been -- an Eastern District

15   case that made that observation, not every sexual harassment

16   case is also a retaliation case.  This is what I meant about

17   conflating the test.  There is not a single case that plaintiff

18   cites -- not a single case I am aware of where silence

19   constitutes protected activity sufficient to create a

20   retaliation claim.  You might, in a case, be able to establish

21   a panoply of behavior that would suggest that there is some

22   causality to a failure to hire.  That is not a retaliation

23   claim and that is the claim that is being conflated here.

24   There is not a single case that says silence constitutes

25   protected activity is the equivalent of complaining.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

L7K5areA

1          THE COURT:  What about if someone said, *I'm in room*

2 *919, if you want to talk about your career, come meet me there.*

3 And the person didn't show up.  Would that be considered --

4 would you consider that protected activity?

5          MS. McKENNA:  No, your Honor.  No, your Honor.  And,

6 in fact, the case that I was thinking of actually was not an

7 Eastern District case, it is a Southern District case, the

8 *Núñez* case, and the Court makes the point if mere rejection was

9 protected activity every harassment claim would automatically

10 state a retaliation claim and the Court notes that the purpose

11 of retaliation prohibition is to prevent interference with the

12 anti-discrimination statute.  And here these allegations, on

13 their face in the complaint, are not sufficient under the

14 existing case law or, frankly, under common sense, your Honor,

15 to make it protected activity.

16          THE COURT:  Common sense.  So, you think if an

17 employer says, come to my room now, and if you don't engage in

18 this conduct with me you are done at Fox News, that's not going

19 to -- and the person chooses not to go, that's --

20          MS. McKENNA:  That may be a little different, your

21 Honor.  That may be what -- and I didn't address this in my

22 opening remarks to you.  Maybe that states some form of a *quid*

23 *pro quo* claim if that person has power and authority to hire

24 but it does not, your Honor, state a retaliation claim.

25          THE COURT:  Why don't you address the fact of the *quid*

L7K5areA

1    *pro quo* claim here and we will move on to sanctions because I

2    know we have been here a while.

3            MS. McKENNA:  Yes.

4            So, overall, the allegations by Ms. Areu is that she

5    was subject to some alleged kind of casting couch process but

6    that theory is one that comes from Ms. Areu's opposition, it is

7    nowhere mentioned in her complaint and it is just an attempt,

8    as I was talking about a moment ago, to repackage her

9    insufficient retaliation claim.  Her *quid pro quo* claim fails

10   because she fails to allege that any of the individuals

11   involved were supervisors, she fails really to allege a sexual

12   advance.  Notwithstanding your Honor's observation about being

13   subtle those are not there and she fails to allege any tangible

14   job benefits that were tied to that sexual advance.  So, for

15   example -- and I know we have been through this, I don't want

16   to belabor this, your Honor -- but in the Hannity case she

17   talks about throwing money on the table.  It doesn't involve a

18   sexual advance as to her let alone a job offer in exchange for

19   sex.

20           With respect to Mr. Carlson, this fabricated

21   obligation that he told her he would be staying alone in his

22   hotel room, there is no offer of employment here.  Her own

23   complaint make it clear -- well, the paragraph below the one

24   you cited before, your Honor, 154, that he doesn't have a job

25   for her.  With respect to Mr. Kurtz' allegation that she

L7K5areA

1    fabricates that this is somehow a sexual advance, as I noted

2    before about this making a mental note comment, it can't

3    reasonably be construed as involving a sexual advance let alone

4    much in the nature of hiring in exchange for sex.  By the

5    way -- and I just looked at them before, your Honor -- in the

6    text exchange between the two of them, he says I'm going to

7    bed.  You know, if he was interested in a sexual relationship

8    with her, your Honor, I would rather suppose he would have

9    stayed up.

10            THE COURT:  Does the *quid pro quo* have to be explicit?

11            MS. McKENNA:  It has to be sufficient so that the

12    request for sexual favors is there.  And with Mr. Caldwell,

13    Ms. Areu doesn't even respond to the argument that his lunch

14    invitation can't be construed as a sexual advance.  If every

15    time a man asks a woman to go to lunch becomes an act of sexual

16    harassment we are on a very bad road, your Honor -- a very bad

17    road.  On top of all of that there is no indication that he had

18    any power, any authority to offer her any form of employment so

19    she has really failed to state a *quid pro quo* claim.

20            With respect to Mr. Henry, as I said before, he was

21    not Ms. Areu's manager or supervisor, there is no allegation

22    that the company knew or should have known about his behavior.

23    In that connection, your Honor, counsel's reference to

24    Mr. Henry's allegations who is a defendant here, I might note,

25    established something with respect to the allegations before

L7K5areA

1    you is just, on its face, ludicrous.  Those constitute his

2    allegations although they are not Ms. Areu's allegations and

3    they are not before the Court.

4            THE COURT:  Again, we have been here a long time.  Do

5    you want to briefly address sanctions?  I have read all of your

6    papers so if there are any final comments you want to make on

7    those motions I will hear you briefly.

8            MS. McKENNA:  I will say only this, your Honor.  Fox

9    News' sanctions allegations against Ms. Areu and her counsel

10   are warranted because the allegations made in both in the

11   original complaint and in the amended complaint are both

12   factually and legally frivolous.  They are factually

13   frivolous -- and we have gone over some of this -- as to each

14   of the individual defendants.  I won't go back to the legally

15   frivolous, your Honor, as to employee status and jurisdiction

16   unless your Honor has questions about that, I am not wanting to

17   belabor that.

18           THE COURT:  No, I don't.

19           MS. McKENNA:  And I would say that the amended

20   complaint did nothing to cure the problem.  The amended

21   complaint, as well as the original complaint, is deficient and

22   frivolous for the same reason the August 7 letter, safe harbor

23   letter that we sent to Mr. Wigdor who was then counsel,

24   identified three fabricated actions of sexual misconduct as to

25   Mr. Carlson, Mr. Hannity, Mr. Kurtz and the two frivolous legal

L7K5areA

1    claims.  The Rule 11 motion that is before you --

2              THE COURT:  But she is still asserting that those

3    facts are true so those are still facts in dispute.

4              MS. McKENNA:  Well, the fact that they are disputed

5    may or may not -- and I hoped I have convinced your Honor

6    not -- they're not factual disputes for purposes of the motion

7    to dismiss.  But, just saying there is a factual dispute

8    doesn't get her beyond sanctions.  It is not the same standard

9    under Rule 11 as it is under Rule 12.

10             THE COURT:  I'm saying that when I have a declaration

11   on one side saying that something didn't happen and my wife was

12   with me that night and etc., etc., and her saying this did

13   happen -- I haven't had a hearing, I haven't assessed people's

14   credibility, there are still facts in dispute with respect to

15   some of those allegations, some I understand have been

16   withdrawn but there still are a good number of factual

17   disputes, correct?

18             MS. McKENNA:  I would say that for purposes of the

19   sanction motion there is no dispute that the claims were

20   legally frivolous and certainly no factual dispute that I see,

21   your Honor, about the question of Mr. Kurtz' behavior, the

22   question of Mr. Hannity's behavior.  Maybe you think there is a

23   dispute with respect to Mr. Carlson I think not because her

24   original complaint says he invited me in December to the

25   company's Christmas party, he said he was alone in his hotel

L7K5areA

1    room, then we say, no, actually she wasn't at the December

2    party, the only time she was present was November 30, that's

3    the date she appeared and, by the way, that happens to be the

4    date of an intimate Christmas party that he gave at which his

5    wife was present.  And then the amended complaint goes, oh,

6    well, he still said he was alone and I understood that to be a

7    request for some future sexual escapade.  It's very clear that

8    the facts are quite different than they were alleged in the

9    original complaint, that could have been found out by her then

10    counsel, was certainly known to Ms. Areu.

11        And lastly, your Honor, I would say, if your Honor

12    believes that there is a factual dispute with respect to

13    whether or not sanctions are appropriate, we would not be

14    hostile to discovery in order to determine whether or not

15    sanctions are appropriate because what is very troubling here,

16    your Honor, is we remain convinced that this complaint from

17    Ms. Areu was filed with an improper purpose.  This was an

18    attempt to hitch Ms. Areu's allegations about three of the more

19    important talent on Fox News to Ms. Eckhart's allegations in

20    order to try and get Fox to settle this matter.  And when they

21    did not, they filed anyway.  And when we told them, as we said

22    we would do, that we would file a Rule 11 motion, then

23    Mr. Wigdor passes off the case -- we already had this argument

24    with you, your Honor, in connection with the severance

25    motion -- passed this case on to Mr. Valli and says, *hot*

L7K5areA

| | |
|---|---|
| 1 | *potato, nothing I can do about this.*  The fact of the matter is |
| 2 | those allegations could have been reasonably investigated at |
| 3 | the time, they were known to Ms. Areu, they are untrue, and the |
| 4 | only resource my client has, particularly the talent here who |
| 5 | have been publicly excoriated and incorrectly, is to be able to |
| 6 | have their day to have sanctions.  And it is very clear that |
| 7 | there were factually frivolous claims made in the original |
| 8 | complaint, there were factually frivolous claims made in the |
| 9 | amended complaint, and that conduct is sanctionable. |
| 10 | THE COURT:  All right. |
| 11 | Ms. Foti, would you like to be heard further? |
| 12 | MS. FOTI:  Not on this, your Honor. |
| 13 | THE COURT:  OK. |
| 14 | MS. FOTI:  One point on the motion to dismiss. |
| 15 | Just in terms of getting back to the elements on the |
| 16 | retaliation claim, there has to be an adverse employment action |
| 17 | and nothing that Mr. Henry is alleged to have done in |
| 18 | connection with Ms. Areu in terms of stopping the back and |
| 19 | forth texting, stopping the relationship, indicates an adverse |
| 20 | employment action.  There never was any employment action at |
| 21 | all on his part in connection with her, there was never an |
| 22 | adverse employment action in connection with retaliation. |
| 23 | THE COURT:  Thank you. |
| 24 | Anything else you would like to say today, Mr. Valli? |
| 25 | MR. VALLI:  Your Honor, just on the sanctions motion. |

L7K5areA

```
1          Counsel can disagree as to facts, they can fight over
2     claims, they can fight over damages.  This is outrageous, to
3     use this motion in an attempt to quash us, in an attempt to
4     silence us and our client.  We asked them for a meet and
5     confer.  We said sit down with us, give us an extension.  Let's
6     discuss this so we can figure it out.  Crickets.  And then they
7     filed a motion.  The greatest thing she just said, the original
8     complaint was filed for an improper purpose, to bolster
9     Eckhart's claims.  Ours wasn't.  We've been severed.  Why are
10    you coming after us?  You can read the motion, Judge.  I do
11    think a strongly-worded order or sanction to the defendants
12    that they cannot use Rule 11 in this fashion is needed because
13    I have been doing this a long time and this is the first time I
14    have had to deal with something like this.
15         Thank you.
16         THE COURT:  Thank you, all.  I will reserve decision
17    and I will see many of you tomorrow.
18                              o0o
19
20
21
22
23
24
25
```